[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————

No. 94-4803

————————

D. C. Docket No. 94-14037-CR-KLR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIE WILLIAMS, a.k.a. Knot,
 JACKIE RUE,

Defendants-Appellants.

————————

No. 95-4237

————————

D. C. Docket No. 94-14018-CR-KLR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JACKIE RUE,

Defendant-Appellant.

————————

No. 95-4238

D. C. Docket No. 94-14019-CR-JCP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JACKIE RUE,

Defendant-Appellant.

Appeals from the United States District Court
for the Southern District of Florida

**(June 30, 1998)**

Before TJOFLAT and BARKETT, Circuit Judges, and GODBOLD, Senior Circuit Judge.

2

TJOFLAT, Circuit Judge:

Jackie Rue and Willie Williams challenge the sufficiency of the evidence supporting their convictions on one count of conspiracy to distribute cocaine base (crack cocaine) in violation of 21 U.S.C. sections 841(a)(1) and 846 (1994). In addition, Rue appeals the district court's attribution to her, at sentencing, of 500 grams of cocaine base -- an amount that she had negotiated to sell to a government agent but which she did not deliver -- arguing primarily that the district court applied an incorrect legal standard in determining whether Rue had the intent and capability to produce the agreed-upon amount of drugs. We affirm appellants' convictions and Rue's sentence.

I.

In 1991, as part of an ongoing investigation by a combined federal and state agency task force investigating the distribution of cocaine base in the Vero Beach and Gifford areas of Indian River County, Florida, undercover government agents began purchasing crack cocaine from Jackie Rue. An undercover officer operating with the assistance of a confidential informant purchased 11.6 grams of crack from Rue on September 13, 1991. On November 15, 1991, an undercover officer purchased an additional 34.4 grams of crack.[1]

On November 20, 1991, detective Maurice Spates of the St. Lucie County Sheriff's Office, operating undercover, called Rue's pager number; Rue returned his call. Spates asked Rue if she could sell him two ounces of crack. Rue responded in the affirmative, but told Spates

_____

[1] These transactions were not charged in the indictments that led to the convictions underlying this appeal.

3

that he would have to wait for an hour or two because she only had powder cocaine and needed to "cook" the crack. Rue told Spates that the crack would cost $1,400. Spates called again later and asked Rue for an additional half-ounce of crack. After a third call, during which Rue and Spates arranged a meeting site, Rue met Spates and exchanged the crack for $2,000. Analysis from the Southeast Regional Laboratory of the Drug Enforcement Administration determined that the parcel sold by Rue contained 61.8 grams of cocaine base.

On March 4, 1992, Spates again contacted Rue to arrange for a crack purchase. Spates told Rue that he had $1,600; Rue told him to drive closer to the Gifford area of Indian River County and call her again. After Spates' second call, Rue met him and Spates followed Rue to another location. Rue then got in Spates' vehicle and told Spates that she did not have all of the crack, but that Timothy Marvett Brown, her brother, had the remainder. She got out of Spates' vehicle and approached Brown, who was waiting nearby on a motor scooter. Brown gave Rue the crack and Rue gave Brown $1,500. Rue got back in Spates' vehicle and gave him 16 small plastic bags, later determined to contain 45.9 grams of cocaine base. Rue and Spates then discussed possible future purchases of larger quantities of crack.

Not until February 4, 1994, nearly 2 years after their last transaction, did Spates seek Rue to make another purchase. On that day, Spates drove to Rue's home in Gifford to look for her. An unknown black male at her residence directed Spates to Rue's place of business, "240 Shorty's," and gave Spates her pager number. Spates found Rue at 240 Shorty's, where, after indicating that she remembered him, she informed him that she was not in a position to make a sale. Spates then left and paged Rue. Rue returned his call and told him that she had been

4

surprised by his earlier appearance, but that if he came back to 240 Shorty's, she would sell him an ounce of crack. Spates returned and Rue sold him 22.8 grams of cocaine base for $1,000.

The three transactions described above formed the basis for the four counts brought against Rue in district court cases no. 94-14018 and no. 94-14019. The November 20, 1992 transaction and the February 4, 1994 transaction were the basis for counts one and two, respectively, of Rue's indictment in no. 94-14018. The March 4, 1992 transaction involving Rue's brother Brown resulted in the two-count indictment in no. 94-14019. Rue pled guilty to all four counts on May 9, 1994, and does not dispute her culpability nor the amount of drugs attributed to her from those transactions. Her sentencing on these four counts, however, was consolidated with her sentencing in district court case no. 94-14037, discussed below, in which both Rue and Williams were adjudged guilty by a jury of conspiring to distribute cocaine base, and she does appeal the sentence imposed by the district court at the consolidated sentencing hearing. She has therefore appealed from cases no. 94-14018 and no. 94-14019 as well.[2]

The drug transaction that formed the basis for the indictment against both Rue and Williams in district court case no. 94-14037 for conspiracy to distribute cocaine base, and upon which this appeal is substantially based, took place between February 15 and February 25, 1994. What follows is a summary of the facts presented to the jury in that case.

On February 15, 1994, Spates called Rue's pager number; Rue subsequently returned his call. During the conversation, Spates told Rue that he wanted to purchase a half-kilo of cocaine, and they discussed a purchase price. No specific date for the transaction was set; Rue simply

_____

[2] Appeals no. 95-4237 and no. 95-4238, arising from Rue's guilty pleas in district court cases no. 94-14018 and no. 94-14019, respectively, are thus premised solely upon Rue's sentence at her consolidated sentencing hearing on January 5, 1995.

told Spates to give her a call when he was in town later the next week.  Although Spates attempted to record the telephone call, his recorder malfunctioned.

Spates paged Rue again on February 18.  Spates successfully recorded the conversation he had with Rue when she called back later that day.  In this conversation, a tape of which was played for the jury at Rue and Williams' trial, Spates and Rue again discussed the size of the transaction.  Rue said, "[y]es, you're talking about half of the whole K" --  half of the whole kilogram of cocaine --  for which she stated the price would be $14,000.  Rue subsequently said that the price might be $1,000 lower, and told Spates "[e]very time you come back it get [sic] lower."  Rue also informed Spates that she could complete the deal at any time -- "I told you I'll be ready whenever, just give me a call."

On the morning of February 25, 1994, Spates paged Rue from the lobby of a Holiday Inn in Vero Beach.  When Rue called him back, Spates told her that he was ready to make the purchase, and told her that he had rented a room at the hotel where she could call him.  Rue asked Spates to call her back from the pay phone for fear the conversation in the hotel room might be monitored.  This conversation was not recorded.  About thirty minutes later, Spates paged Rue again.  He taped the conversation that ensued when Rue called back.  Spates asked if Rue could deliver the drugs to the hotel because he was having car trouble.  Rue told Spates that if she could not deliver the drugs, someone else could deliver the drugs for her.  She also told Spates that she was indeed lowering the price to $13,000, but she told him that she had sold half of the crack and would need an hour to "cook" another quarter-kilo of crack for him.

An hour after the second call, at about 9:20 a.m., Spates paged Rue a third time; she once again called him back in the lobby of the hotel.  Rue told Spates that she had all of the cocaine,

6

but that he would need to come to 240 Shorty's to complete their deal. Equipped with a body transmitter that allowed other officers to monitor the situation and record any conversations, Spates drove to 240 Shorty's. When he arrived, Rue and Williams were in a black Ford Bronco in the parking lot. Rue and Spates then entered 240 Shorty's, and Rue took Spates to the back of the store to find a bag for the money. Once Spates told her the money was already in a bag in his car, the two went back outside and retrieved the $13,000, which Spates gave to Rue.

Joined by Williams, Spates and Rue walked from Spates' vehicle to a black Nissan 300ZX. Rue got into the car, at which point Spates asked her where she was going with the money. Rue told Spates that she had to go get the crack. Williams, who was standing by the car, told Spates, "[w]ith this much stuff, we have to have the money first. That's the way we do business." Williams explained that Spates had not been around in "about a year" and that was the way that they had to do business now. Otherwise, Williams said, he did not want to do the deal. Spates acquiesced and Rue drove away with the money.

After Rue left, Spates returned to his vehicle to wait. Williams got in the black Bronco and started to leave, then got out and approached Spates' vehicle. Williams asked Spates if he was a police officer, and whether he was recording the conversation. Spates said "no," and Williams returned to the Bronco and drove away. Williams drove back into the parking lot several minutes later, picked up another man, and drove away again. Fifteen minutes after this, Williams came back and dropped off the unidentified man and drove away again. Williams returned a third time, parked, and entered an establishment next to 240 Shorty's -- the Timothy Creag Game Room. At some point during this period of time, Spates got out of his vehicle and walked toward railroad tracks that adjoined the parking lot.

7

Shortly after Williams entered the Timothy Creag Game Room, he emerged accompanied by a man who Spates knew to be Austin Powell. The two approached Spates and began to press Spates again about his identity. Williams asked Spates if he was Rickie Clark, who is an undercover investigator for the Broward County Sheriff's Office. When Spates responded in the negative, Williams and Powell walked across the railroad tracks and across a highway, approaching another vehicle. That vehicle was an undercover surveillance vehicle monitoring the operation. Williams knocked on the driver's side window and asked the occupant what he was doing. When the driver did not respond, Williams walked back toward the Timothy Creag Game Room and placed a telephone call on a pay phone nearby. Minutes later, Spates was told by an unidentified man that Rue had returned and that he should come to 240 Shorty's.

Rue met Spates in front of her business and returned the $13,000 to Spates. Spates asked her why she was returning the money. Rue simply kept responding that she could not do the deal. Recognizing that the deal would not be completed, Spates got back in his vehicle and drove away. Williams and an unidentified man followed Spates from the area in a white Pontiac Grand Am, although Spates subsequently succeeded in evading them. After Spates was safe, police officers in marked police vehicles approached 240 Shorty's to arrest Williams and Rue. When the first police vehicle approached, Williams -- who had returned to the area -- turned and fled. Both Williams and Rue were arrested that same day.

Based on the events between February 15 and February 25, 1994, a grand jury indicted Williams and Rue on March 10, 1994, charging them with a single count of conspiracy to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846. Both Williams and Rue pled not guilty. After a two-day trial, a jury found both Williams and Rue guilty as charged.

8

A pre-sentence investigation report (PSI) was prepared for each appellant. Both Williams and Rue filed objections to their PSIs with the district court. The district court held Williams' sentencing hearing on July 15, 1994. The court overruled Williams' objections to his PSI, and, finding pursuant to U.S.S.G. § 4B1.1 that Williams was a "career offender," sentenced Williams to 360 months imprisonment.

On January 5, 1995, the district court held a consolidated sentencing hearing for Rue, covering all five counts upon which she was convicted in the three separate actions. In response to objections raised by Rue to the calculation of her offense level in the PSI, and over the government's objection, the district court granted Rue a two-level reduction for acceptance of responsibility and held that her sentence should not be enhanced two levels for obstruction of justice. In addition, and also over the government's objection, the district court accepted the recommendation of the probation officer who drafted the PSI and held that Rue was not on probation at the time she committed the offenses; a contrary finding would have added two criminal history points to Rue's final criminal history calculation.

At the sentencing hearing, Rue also argued that the full half-kilo of cocaine base should not be attributed to her in calculating her offense level, because the government had not demonstrated that she had both the intent and the capability to produce that quantity of drugs. Rue's counsel strenuously asserted that Rue never intended to sell the drugs to detective Spates, but intended merely to take his money. Given that her past transactions with Spates had been for smaller quantities, counsel also argued that the government had not demonstrated that she had the ability to produce the half-kilo of crack. The district court ultimately determined that Rue was liable for the entire half-kilo that she offered to sell to Spates, and for which she accepted

9

his money.  The court sentenced Rue to 168 months imprisonment, at the bottom of the guideline range of 168-210 months.

II.

Both Williams and Rue appeal their convictions for conspiring to distribute cocaine base between February 15 and February 25, 1994, challenging the sufficiency of the evidence upon which they were convicted of conspiring to distribute cocaine base.  Williams moved for judgment of acquittal at the conclusion of the government's case in chief.  The district court denied Williams' motion.  Subsequent to the jury's verdict, Williams moved the district court for a new trial.  Although his motion was denied, Williams thereby preserved for appeal his claim of insufficient evidence.  We therefore review Williams' challenge to the sufficiency of the evidence <u>de novo</u>, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict.  <u>See</u> <u>United States v. Delgado</u>, 56 F.3d 1357, 1363 (11th Cir. 1995) (citing <u>United States v. Kelly</u>, 888 F.2d 732, 739 (11th Cir. 1989), and <u>Glasser v. United States</u>, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), <u>superseded by statute, in part, as recognized in</u> <u>Bourjaily v. United States</u>, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987)).  "We ask whether a reasonable trier of fact, when choosing among reasonable constructions of the evidence, could have found the defendant guilty beyond a reasonable doubt."  <u>Id.</u> (citing <u>Kelly</u>, 888 F.2d at 740).

Although Rue asserted in her testimony at trial that Williams did not have anything to do with the drug deal between Spates and herself, we believe that the evidence adduced at trial, as summarized above, demonstrates otherwise.  That evidence included Williams' statement that

"[w]ith this much money, we have to have the money first. That's the way we do business." (emphasis added). Further, Williams attempted to root out Spates' identity as an undercover police officer, and to identify undercover surveillance of the parking lot at 240 Shorty's. Strong circumstantial evidence suggests that Williams called off the deal when his suspicions were sufficiently aroused that the transaction was a sting. Finally, Williams ran when officers in a marked police vehicle approached 240 Shorty's for the purpose of arresting him. We believe that there was sufficient evidence for a reasonable trier of fact to have found Williams guilty beyond a reasonable doubt of conspiring with Rue to distribute cocaine base. Williams' assertion that the government presented insufficient evidence to convict him of conspiracy to distribute cocaine base is, therefore, rejected.

Rue also moved for judgment of acquittal at the conclusion of the government's case in chief. After the government rested its case, however, Rue testified on her own behalf, and she did not subsequently renew her motion for judgment of acquittal. "In our circuit, a defendant's decision to present [her] case after denial of a motion for judgment of acquittal operates as a waiver of [her] objection to the denial of [her] motion for acquittal." United States v. Jones, 32 F.3d 1512, 1516 (1994) (citations omitted). Because Rue did not renew her motion at the close of all of the evidence, her conviction will be affirmed absent a miscarriage of justice. See id.; see also United States v. Tapia, 761 F.2d 1488, 1491-92 (11th Cir. 1985) (defining manifest injustice as requiring "a finding that the evidence on a key element of the offense is so tenuous that a conviction would be shocking" (internal quotation marks and citation omitted)). Given that Rue bases her sufficiency challenge upon the same evidence that we have found sufficient to affirm Williams' conviction, Rue clearly cannot demonstrate the requisite "miscarriage of

11

justice" necessary to overturn her conviction.  Her claim that the government presented insufficient evidence to support her conviction, therefore, fails.

In addition to her sufficiency claim, Rue challenges the district court's attribution of the half-kilo of cocaine to her at sentencing.  Rue raised the issue of attribution at her sentencing hearing, arguing that the evidence demonstrated that she never intended to deliver the promised half-kilo of cocaine to Spates, but instead intended to steal Spates' money.  She also argued that the government had not proven her ability to procure such a large quantity of drugs, given that her past transactions with government agents, although all successfully completed, were for smaller amounts of crack.  The district court, after hearing extended arguments from counsel for Rue and from the opposing Assistant United States Attorney, decided to hold Rue accountable for the entire half-kilo of crack that she had promised to deliver.  Rue did not object to the district court's ruling that she was responsible for the entire amount of crack, nor did she object to her sentence at the time that it was imposed.[3]  In accordance with this court's opinion in United States v. Jones, 899 F.2d 1097, 1102-03 (11th Cir.), cert. denied, 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990), overruled on other grounds, United States v. Morrill, 984 F.2d 1136, 1137 (11th Cir. 1993) (en banc), the district court asked Rue whether she had any objections to its findings of fact or the manner in which the sentence was imposed.  See id. at 1102 (instructing the district courts "to elicit fully articulated objections, following imposition of sentence, to the court's ultimate findings of fact and conclusions of law").  Rue's counsel

---

[3]     In fact, Rue's counsel thanked the judge for his findings and his rulings at her sentencing hearing, stating, "[w]e appreciate the time you have given to this sentencing.  We appreciate the rulings and we appreciate everything you say, and Jackie Rue agrees.  She made some terrible mistakes and I think in the future, when she does get out, I think that she can turn her life around."

responded that she did not. "Where the district court has offered the opportunity to object and a party is silent or fails to state the grounds for objection, objections to the sentence will be waived for purposes of appeal, and this court will not entertain an appeal based upon such objections unless refusal to do so would result in manifest injustice." Id. at 1103. In order for this court to reverse her sentence and remand her case to the district court for resentencing, therefore, Rue must demonstrate that holding her responsible for the half-kilo of crack that she agreed to sell to Spates is "manifestly unjust."

The crux of Rue's argument is that the government did not satisfy its burden, under U.S.S.G. § 2D1.1, comment. (n.12), of demonstrating that she had both the intent and ability to sell the half-kilo of crack to Spates. At the time that Rue was sentenced, the 1994 version of the United States Sentencing Guidelines was in effect. Application Note 12 to U.S.S.G. § 2D1.1 (1994) stated:

> In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

U.S.S.G. § 2D1.1, comment. (n.12) (1994). In United States v. Tillman, 8 F.3d 17 (11th Cir. 1993), we interpreted this precise language to require, in an uncompleted transaction, that the government bear the burden of demonstrating that the defendant had either the intent to produce the negotiated amount of drugs or the reasonable capability of producing that amount of drugs. See id. at 19. As the district court aptly noted at sentencing, it would have been impossible for the court to have found that Rue did not possess the intent to produce any drugs given the jury's

13

guilty verdict on the sole count of conspiring to distribute cocaine base.[4]  Otherwise, the district court would have had to throw out the conviction, because Rue would have had an intent to steal Spates' money, not an intent to distribute crack.

In addition, the government provided extensive evidence at trial demonstrating Rue's intent to provide the negotiated quantity of drugs -- evidence to which the prosecution referred in detail at sentencing.  Much of the evidence came from the government's recordings of Rue's numerous conversations with Spates regarding the transaction.  On all occasions Rue promised to deliver the drugs, and she quoted Spates the prevailing rate for a half-kilo of cocaine at that time.  On the date of sale, Rue asked Spates how he wanted the drugs delivered, in separate bags or together, and even gave Spates a $1,000 discount on the price, telling him that the price would continue to get lower as the volume of their transactions increased.  Rue also told Spates that she needed an hour before she could complete the transaction.  She stated, "it's not that I'm not ready, just the other half's just gone.  I just gotta [sic] do it up again."  Spates explained that this meant Rue had sold half of the crack and needed to "cook" more powder cocaine into crack before she could complete the sale.  These conversations provide more than sufficient evidence of Rue's intent, and, as noted above, the jury's guilty verdict on the conspiracy to distribute cocaine base count precludes us from finding, as Rue urges, that she intended to steal Spates' money.  Application Note 12, as interpreted in Tillman, would thus require the district court to attribute the entire half-kilo of crack to Rue.

_____

[4]      The district court stated, "I think that I would have to acknowledge that it was probably a drug deal because the jury so found."  In addition, the prosecutor cited to Tillman at the sentencing hearing, and argued, correctly, that the jury found intent "beyond a reasonable doubt" when it found Williams and Rue guilty of conspiring to distribute cocaine base.

Both the government and Rue argue in their briefs to this court, however, that we should not apply Application Note 12 as it existed at the time of sentencing, but rather, that we should apply the Note as it appears now, after its amendment in 1995.[5]  Amended Application Note 12 now states, in relevant part:

> In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level . . . .  If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.

U.S.S.G. § 2D1.1, comment. (n.12) (1997).  Rue argues that the amended guideline clarifies that the defendant need only show that she lacked either intent or ability to provide the negotiated quantity of drugs.  The government argues that the amended guideline shifts the burden of proof from the government to the defendant.  Although it is true that we apply clarifying amendments retroactively in this circuit, see United States v. Scroggins, 880 F.2d 1204, 1215 (11th Cir. 1989) (stating that amendments that "do not effect a substantive change, but rather are intended only to clarify the rule adopted by a particular guideline . . . constitute strongly persuasive evidence of

---

[5]  Rue also argues that the district court misapplied the correct legal standard under the previous version of Application Note 12, as the Note was construed in Tillman.  She claims that the district court, after being erroneously advised by the prosecutor, put the burden on her to demonstrate that she had neither the intent nor the ability to provide the negotiated amount of drugs.  Contrary to her claim, the district court asserted that the burden was on the government, and the prosecutor merely said he did not think it was.  The prosecutor then went on to refer extensively to the evidence produced by the government demonstrating that Rue had both the intent and the ability to distribute the half-kilo of crack, although the prosecutor also pointed out -- once he located the correct standard -- that Tillman required the government only to prove intent or ability.  All of this occurred before the district court ruled that Rue was liable for the entire half-kilo.

15

how the Sentencing Commission originally envisioned that the courts would apply the affected guideline," and therefore apply retroactively), cert. denied, 494 U.S. 1083, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990), it is not at all clear that this amendment is merely clarifying and should be applied to defendants, such as Rue, sentenced before the amendment's effective date. Compare United States v. Ynfante, 78 F.3d 677, 682 n.4 (D.C. Cir. 1996) (noting that the amendment to Note 12 was not described as clarifying by the Sentencing Commission, nor listed in U.S.S.G. § 1B1.10 (1995), among the amendments that could be applied retroactively), and United States v. Conway, 86 F.3d 1158, No. 95-2261, slip op. at 3-4 (7th Cir. May 15, 1996) (unpublished table opinion) (noting that burden now is on the defendant to prove lack of intent and ability but applying pre-amendment version in effect at time of sentencing), with United States v. Marmolejos, 140 F.3d 488, 491-93 (3rd Cir. 1998) (discussing arguments for and against retroactive application of the amendment to Note 12 and applying a different clause of the amendment retroactively in context of a completed drug sale because it resolved ambiguity), and United States v. Felix, 87 F.3d 1057, 1060 (9th Cir. 1996) (applying amendment retroactively but again in context of completed transaction); see also United States v. Hazut, 140 F.3d 187, 191-92 (2nd Cir. 1998) (interpreting current version of Application Note 12 as placing burden on government to prove intent and ability and placing burden on defendant to respond to prosecution's evidence). In any case, we need not decide here whether the 1995 amendment to Application Note 12 applies retroactively, nor whether the amendment changes the required evidentiary showing or shifts the burden of proof. Even assuming the interpretation of Application Note 12 most favorable to Rue -- that the Note requires the government to prove, by a preponderance of the evidence, that Rue possessed both the intent and ability to provide the

16

negotiated amount of crack -- Rue still cannot demonstrate that affirming the district court's sentence would be "manifestly unjust."

The statements Rue made in her recorded conversations with Spates -- especially her quotation of the market price for the half-kilo, her inquiry about how Spates preferred to have the crack packaged, and her statement that she needed an extra hour to cook the rest of the crack -- coupled with the evidence of Rue's prior successful drug transactions, totaling over 175 grams of crack, sufficiently demonstrated that Rue had the ability to deliver on her promise to produce 500 grams of crack cocaine. When prodded by the district court as to whether or not Rue could produce any witnesses to support her claim that she was incapable of delivering the negotiated amount, Rue's counsel flatly stated that "she doesn't have any witnesses because there just aren't any witnesses." On this evidence, it is impossible for us to find that attributing the entire half-kilo of crack to Rue would be "manifestly unjust" such that we would be required to remand her case for resentencing.

III.

For the foregoing reasons, the convictions of Willie Williams and Jackie Rue for conspiring to distribute cocaine base are AFFIRMED, and the sentence the district court imposed on Rue at her consolidated sentencing hearing is also AFFIRMED.

AFFIRMED.