[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16441

_____

D.C. Docket No. 1:16-cr-00025-SCJ-LTW-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

EDWARD TOWNSEND,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(December 26, 2017)

Before MARCUS and NEWSOM, Circuit Judges, and MOORE,[*] District Judge.

PER CURIAM:

A jury found Defendant Edward Townsend guilty of one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and four counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The district court sentenced Defendant to forty-eight months and eight days of imprisonment, followed by a three-year term of supervised release. In addition, Defendant was ordered to pay $5,679.75 in restitution.

Defendant appeals his conviction and sentence on four grounds. First, Defendant argues that the Government failed to offer any evidence at trial that he had any role in or knowledge of the underlying fraud scheme. Second, Defendant contends that the Government presented insufficient evidence at trial for a reasonable jury to conclude that he aided and abetted the substantive money laundering counts. Third, Defendant maintains that the district court erroneously applied the business-records exception to permit the introduction of certain documents. Finally, Defendant reasons that the district court incorrectly calculated his sentencing guidelines by including in the loss amount funds that were unconnected to the underlying criminal conduct. For the following reasons, Defendant's conviction and sentence are affirmed.

---

[*] Honorable William T. Moore, United States District Judge, for the Southern District of Georgia, sitting by designation.

2

## I.    BACKGROUND

This case starts with an all too common fraud scheme that involves individuals phoning citizens and falsely informing them that a warrant had been issued for their arrest for failing to appear for jury duty.[1] The fraudsters then attempt to convince their victims that they can avoid being arrested by immediately paying a fine. The victims are told that the fine can only be paid by using GreenDot MoneyPaks—a cash substitute service that operates by loading funds onto prepaid debit cards. Once loaded, the victim can then use the internet or phone to transfer the funds on the MoneyPak. Transferring funds only requires a fourteen-digit PIN number for the MoneyPak and the number of the receiving account. Physical possession of the MoneyPak is not required so long as the individual transferring the funds knows the fourteen-digit PIN. A MoneyPak is intended and designed to operate as cash, meaning that the funds are unrecoverable once transferred from the MoneyPak.

The indictment alleged that unknown inmates housed by the Georgia Department of Corrections ("DOC") executed this type of fraud scheme using contraband cell phones smuggled into various prisons. After a victim was

---

[1] Because a jury convicted Defendant of all charges, the facts are presented in the light most favorable to the Government by resolving all reasonable inferences and credibility determinations in favor of the jury's verdict. *United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011).

defrauded, Defendant, co-Defendant Caeser Futch, co-Defendant Tangela Parks,[2] and others known and unknown engaged in a conspiracy to launder the proceeds of the scheme by immediately transferring the funds from the MoneyPaks to other financial products. Both Defendant and co-Defendant Futch operated this scheme while incarcerated with the DOC. At various times, Defendant and co-Defendant Futch resided at the same prison and for a portion of that time resided in the same cell block. Co-Defendant Parks is co-Defendant Futch's spouse. A fourth, unindicted co-conspirator—Tashandra Williams—is the mother of one of Defendant's children.

At trial, Ms. Williams testified that she assisted Defendant in laundering the MoneyPaks. Defendant would transfer the MoneyPak to prepaid debit cards held by Ms. Williams, who would then purchase new MoneyPaks using those funds. Finally, Ms. Williams would text the PIN numbers for the new MoneyPaks to Defendant. For her role, Ms. Williams would occasionally receive some of the funds.

The Government also presented evidence related to the movement of specific victim's funds. On June 26, 2015, W.M. provided 4 MoneyPaks totaling $2,000 to avoid a purported arrest warrant. At least two of these MoneyPaks were transferred to two separate debit cards held by Ms. Williams. Both transfers

---

[2] Both co-Defendants Futch and Parks pled guilty prior to Defendant's trial.

4

occurred within two hours of W.M. purchasing the MoneyPaks. On the same day, Ms. Williams used the debit cards to make four separate transactions, all within fifteen minutes of each other, at a Rite-Aid: two purchases for $504.95, one for $459.90, and one for $469.90.

On June 30, 2014, T.M. purchased three MoneyPaks totaling $1,372. Approximately forty minutes later, one MoneyPak was transferred to Ms. William's WalMart charge card. Within thirty minutes of their purchase, the other two MoneyPaks were transferred to prepaid debit cards held by an individual named Treion Johnson.

On January 5, 2015, J.G. purchased five MoneyPaks totaling $2,283. Approximately fifty minutes after the purchase, two of the MoneyPaks were transferred to an American Express debit card and a PayPal account, both in Defendant's name. Within thirty-five minutes, two other of the MoneyPaks were transferred to co-Defendant Park's debit card. That debit card was used eighteen minutes later at a Kroger self-checkout kiosk to obtain cash-back. The fifth MoneyPak was never transferred due to a problem with the fourteen-digit PIN.

At trial, the Government used a variety of business records to establish the timing of the phone calls in relation to the transfer of the laundered funds. Defendant objected to five of these exhibits. Two were business records of a company named AccountNow, which had been acquired by GreenDot. The other

5

three were records of Cricket Wireless, which had been acquired by AT&T. The Government called record custodians for the new companies to authenticate both sets of records. The GreenDot custodian testified that he was familiar with AccountNow's recordkeeping because it had been a financial partner of GreenDot prior to its acquisition and he assumed that the records are accurate. Similarly, the AT&T custodian testified that he never worked for Cricket Wireless and had no knowledge of whether it kept good records, but believed the records to be accurate.

Defendant objected to the introduction of these exhibits under the business record exception based on the custodians lacking any personal knowledge of the acquired companies' record-keeping practices. The district court admitted the exhibits, stating that "[t]he foundation requirements that I have to find are trustworthiness and under the circumstances I've heard so far I have not heard anything that would not lead me to believe the trustworthiness of the testimony that these records were prepared the way [the witness] indicated."

At sentencing, the district court calculated the loss amount as $22,724.75. This total included $17,545 that was transferred from various MoneyPaks to Defendant's PayPal account. Defendant argued that the Government failed to establish by a preponderance of the evidence that these funds were from the fraud scheme because it was entirely possible they were generated selling contraband cellular phones in prison. Finding that the Government established by a

preponderance of the evidence that these MoneyPaks came from the fraud scheme, the district court overruled the objection and included those amounts in the total loss, which resulted in a four-level enhancement.

## II.    ANALYSIS

Defendant argues that the Government did not present any evidence that would permit a reasonable jury to conclude that he knew the funds being transferred were the proceeds of the fraud scheme. As a result, Defendant contends that his conviction must be vacated because the Government failed to establish an element of money laundering—that while conducting or attempting to conduct the financial transaction Defendant knew that the property involved in the transaction represented the proceeds of some kind of unlawful activity. In response, the Government primarily relies on the short time frame within which a MoneyPak purchased by a fraud victim would be transferred to Ms. Williams, and then in some cases transferred to Defendant.

When assessing an appellant's challenge to the sufficiency of the evidence, the Court reviews the evidence presented at trial in the light most favorable to the government. *United States v. Dulcio*, 441 F.3d 1269, 1276 (11th Cir. 2006) (citing *United States v. Williams*, 144 F.3d 1397, 1401 (11th Cir. 1998)). The Court must draw all reasonable factual inferences in a manner consistent with the jury's verdict. *Id.* A guilty verdict must stand where a "'reasonable fact-finder could have

determined that the evidence proved' [d]efendants' guilt beyond a reasonable doubt." *United States v. Westry*, 524 F.3d 1198, 1210 (11th Cir. 2008) (quoting *United States v. Smith*, 459 F.3d 1276, 1286 (11th Cir. 2006)).

To convict Defendant, the Government had to prove that "he knew [the] involved funds [] were the proceeds of some form of unlawful activity." *United States v. Tarkoff*, 242 F.3d 991, 994 (11th Cir. 2001). Circumstantial evidence is sufficient to establish that a defendant knew the proceeds were the result of an unlawful activity. *United States v. Frazier*, 605 F.3d 1271, 1282 (11th Cir. 2010) (citing *United States v. Gallo*, 927 F.2d 815, 822 (5th Cir. 1991)). In addition, "[t]he government need not prove that the funds came from a specific illegal action." *Id.*

Viewing the evidence in this case in the light most favorable to the guilty verdict, the Government presented sufficient evidence that would permit a reasonable jury to conclude that Defendant knew the funds were the proceeds of an unlawful activity. The timing of the payments by the fraud victims and the transfer of money is sufficient to permit the jury to infer that Defendant knew the funds derived from the fraud scheme. While Defendant complains of the circumstantial nature of the Government's evidence, direct evidence that Defendant knew that the laundered funds were from the fraud scheme is unnecessary. The jury is entitled to infer such knowledge based upon inferences drawn from the unique circumstances

8

of this case. *See, e.g.*, *United States v. Miller*, 255 F.3d 1282, 1287 (11th Cir. 2001) (finding circumstantial evidence sufficient to allow jury to reasonably infer the defendant knew shotgun barrel shorter than eighteen inches); *United States v. Samuels*, ___ F. App'x ___, 2017 WL 5186317, at *2 (11th Cir. 2017) ("[W]hether the jury could reasonably infer knowledge depends, as common sense would suggest, on the surrounding facts and circumstances." (quoting *United States v. Ayala-Tapia*, 520 F.3d 66, 68 (1st Cir. 2008)); *United States v. Ministre*, 565 F. App'x 806, 809-10 (11th Cir. 2014) (finding circumstantial evidence sufficient to allow jury to reasonably infer the defendant knew purses contained drugs).

Defendant also argues that the Government failed to present sufficient evidence for a jury to find him guilty of the substantive money laundering counts, which are based on four cash-back transactions at a Kroger self-checkout kiosk. Defendant contends that there was no evidence he played any part in those transactions, or aided and abetted the individual performing those transactions. In response, the Government reasons that it presented more than enough circumstantial evidence to permit the jury to reasonably conclude that Defendant aided and abetted co-Defendant Parks in the money laundering transactions.

9

To obtain a conviction for concealment money laundering, the Government must prove beyond a reasonable doubt that the Defendant, "knowing that the property involved in a financial transaction represent[ed] the proceeds of some form of unlawful activity, conduct[ed] or attempt[ed] to conduct such a financial transaction which in fact involve[d] the proceeds of specified unlawful activity– knowing that the transaction [was] designed in whole or in part– to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). A defendant can be convicted of aiding and abetting where he "associate[s] himself with the venture, participate[s] in it as something he wishes to bring about, and seek[s] by his action to make it successful." *United States v. Carter*, 721 F.2d 1514, 1533 (11th Cir. 1984). The Government bears the burden of establishing, by direct or circumstantial evidence, "that the accused shared in the principal's criminal intent as to all the necessary statutory elements of the offense." *United States v. Kriesser*, 731 F.2d 1509, 1516 (11th Cir. 1984); *accord United States v. Pantoja-Soto*, 739 F.2d 1520, 1525 (11th Cir. 1984) ("Direct or circumstantial evidence may be used to prove the essential elements of aiding and abetting."). This Court has provided a useful illustration in *United States v. Brantley*:

> The aiding and abetting requirement of shared intent between the
> aider and abettor and the principal, sometimes referred to as the
> "community of unlawful intent," *see, e.g.*, *United States v. Austin*, 585
> F.2d 1271, 1277 (5th Cir. 1978), is similar to the requirement in

10

conspiracy cases that there be an "agreement." However, shared intent need not rise to the level of agreement. *United States v. Cowart*, 595 F.2d 1023, 1031 (5th Cir. 1979). The fact that here [the defendant] and [the co-conspirator], although not charged with conspiracy, were almost certainly conspirators in fact, emphasizes the strength of "the community of unlawful intent" between [the defendants].

733 F.2d 1429, 1435 n.9 (11th Cir. 1984). A defendant's participation in an underlying conspiracy can support a jury's conclusion that he "expected and encouraged the individual [actions] which constitute the substantive offenses." *United States v. Owens*, 492 F.2d 1100, 1104 (5th Cir. 1974).[3]

Once again, the Government presented sufficient circumstantial evidence for the jury to reasonably infer that Defendant aided and abetted in the commission of the money laundering counts. First, the Government presented evidence that Defendant recruited Ms. Williams to launder funds, making it likely that he also recruited co-Defendant Parks. Second, the Government established that the MoneyPak laundered as part of the Kroger transactions was one of five purchased by J.G. One MoneyPak was deposited into Defendant's American Express account, one into Defendant's PayPal account, and two onto co-Defendant Park's prepaid debit card. The four MoneyPaks were all transferred within one hour of being purchased by J.G. Third, Defendant's splitting of J.G.'s money into several different accounts is evidence of Defendant's involvement in the money

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

laundering. The common source of the funds, the timing of their distribution, and the manner they were laundered is all evidence that would permit a reasonable jury to conclude that Defendant likely assisted co-Defendant Parks in laundering the funds.

Moreover, the illustration in *Brantley* is applicable to this case. Having determined that the Government presented sufficient evidence to support Defendant's conviction for conspiracy to commit money laundering, that conspiracy conviction only "emphasizes the strength of 'the community of unlawful intent' " shared by Defendant, co-Defendant Futch, co-Defendant Parks, and Ms. Williams. *See Brantley*, 722 F.2d at 1435 n.9. The jury could easily conclude that Defendant aided and abetted co-Defendant Parks because he "expected and encouraged" the conduct that formed the substantive money laundering counts—the Kroger cash-back transactions. *Id.*

Defendant also contends that the district court abused its discretion by admitting business records that the Government failed to properly authenticate. Those records were from companies that had been acquired by another entity sometime after the original company created the records in question. Defendant's argument is that the records custodian for the new company is unqualified to authenticate those records due to a lack of knowledge concerning the acquired companies' record-keeping practices. In response, the Government contends that

12

hearsay is admissible under the business records exception if the district court determined that it is reliable, a decision over which the district court enjoys broad discretion. In addition, the Government maintains that any abuse of discretion in admitting the business records is harmless.

> The business records exception to the hearsay rules excludes
>
> [a] record of an act, event, condition, opinion, or diagnosis if:
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). "The touchstone of admissibility under Rule 803(6) is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence." *United States v. Collado*, 439 F. App'x 845, 848 (11th Cir. 2011) (citing *United States v. Arias–Izquierdo*, 449 F.3d 1168, 1183 (11th Cir. 2006)). "To be admitted under that exception the person who actually prepared the documents need not have testified so long as other circumstantial evidence and testimony suggest their trustworthiness. Nor is it required that the records be

13

prepared by the business which has custody of them." *Id.* (quoting *United States v. Parker*, 749 F.2d 628, 633 (11th Cir. 1984)).

Even assuming the Government failed to establish that the requisite conditions for admissibility were "shown by the testimony of the custodian or another qualified witness," Fed. R. Evid. 803(6)(D), any such error in this case was harmless. After reviewing the evidence presented at trial, this Court concludes that there was sufficient evidence outside of these business records supporting the jury's finding of guilt. *See United States v. Arbolaez*, 450 F.3d 1283, 1290 (11th Cir. 2006) ("Evidentiary and other nonconstitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights."). For example, the AccountNow documents were not the only evidence of the movement and timing of the funds fraudulently obtained from W.M. and T.M. Also, Ms. Williams testified how she assisted Defendant in laundering funds using MoneyPaks. In short, the absence of these records provides less corroborating evidence of Defendant's guilt. However, the wealth of other incriminating evidence presented at trial supporting the jury's verdict shows that the "error had no substantial influence on the outcome, [] sufficient evidence uninfected by error supports the verdict, [and] reversal is not warranted." *Id.*

14

Defendant appeals his 48-month and 8-day sentence, arguing that the district court improperly calculated the guideline range because it included all funds deposited into his PayPal account during the period of the conspiracy in its calculation of the loss amount. This Court reviews the district court's determination of facts concerning the amount of money involved in a money laundering scheme for clear error and the interpretation of the Sentencing Guidelines de novo. *United States v. Paley*, 442 F.3d 1273, 1276 (11th Cir. 2006). There is no clear error where the record supports the district court's findings. *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002). The government bears the burden of proving by a preponderance of the evidence actual loss attributable to the defendant's conduct. *See United States v. Stein*, 846 F.3d 1135, 1152 (11th Cir. 2017).

The base offense level for money laundering is "8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds." U.S.S.G. § 2S1.1(a)(2). The table in § 2B1.1(b)(1) does not increase the base offense level if the loss involved $6,500 or less, but increases the base offense level by 4 if the loss was greater than $15,000, but no more than $40,000. *Id.* § 2B1.1(b)(1)(A), (C), (D). The commentary defines loss as "the greater of actual loss or intended loss," with "actual loss" being "the reasonably foreseeable pecuniary harm that resulted from

15

the offense" and "intended loss" being "the pecuniary harm that the defendant purposely sought to inflict" even if "impossible or unlikely to occur." *Id.* § 2B1.1 cmt. n.3(A)(i)-(ii). The commentary explains that "the court's loss determination is entitled to appropriate deference" because the court "is in a unique position to assess the evidence and estimate the loss based upon that evidence." *Id.* § 2B1.1 cmt. n.3(C). The court need only make a reasonable estimate of the loss. *Id.* This is because the amount of loss can be "difficult to determine accurately." *United States v. Bradley*, 644 F.3d 1213, 1290 (11th Cir. 2011) (quoting *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007)).

The district court is permitted to base its loss determination on factual findings derived from "among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." *Id.* (quoting *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004)). The court can employ a variety of methods to derive a "reasonable estimate of the loss" to the victims based on the information available to it. *Stein*, 846 F.3d at 1152 (quoting *United States v. Snyder*, 291 F.3d 1291, 1295 (11th Cir. 2002)). Although the court may estimate the amount of loss, it cannot "speculate about the existence of facts and must base its estimate on reliable and specific evidence." *Id.* (quoting *United States v. Ford*, 784 F.3d 1386, 1396 (11th Cir. 2015)). It can, however, rely on "specific circumstantial evidence" to estimate the amount of loss and it is not

16

required to restrain itself to absolute figures. *Bradley*, 644 F.3d at 1290 (quoting *United States v. Willis*, 560 F.3d 1246, 1251 (11th Cir. 2009)).

The district court did not clearly err by including in the loss amount all of the deposits made into Defendant's PayPal account during the life of the conspiracy, because that finding is supported by sufficient circumstantial evidence from the record. *See Bradley*, 644 F.3d at 1290; *see also Petrie*, 302 F.3d at 1290. Defendant conceded at sentencing that he should be attributed losses from W.M., T.M., and J.G. totaling $3,872. The record supports attributing Defendant with an additional $1,807.75 loss from J.G. because at least some funds from that scheme were transferred to Defendant's PayPal account. The record also supports the conclusion that the remaining $17,045 in deposits made to Defendant's PayPal account was related to the money laundering conspiracy. The amount and timing of those deposits were consistent with Defendant's laundering of the funds obtained from W.M., T.M., and J.G. In addition, the funds in the PayPal account were often withdrawn from ATMs in Columbus, Georgia, where Defendant previously lived and where Ms. Williams resided at that time. After a thorough review, the district court's inclusion of the PayPal funds in the total $22,724.75 loss amount is a reasonable estimate based on the available specific circumstantial evidence presented at the sentencing hearing.

**AFFIRMED**.

17