[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 27, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-11959
Non-Argument Calendar

_____

D. C. Docket No. 05-00205-CR-CG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD MORRISON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(February 27, 2007)**

Before ANDERSON, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

Richard Morrison appeals his conviction and 78-month sentence for one count of maliciously destroying by means of a fire a building, Bronco Bill's Dance Club, a.k.a. Mobile's Pub ("Bronco Bill's"), in Mobile, Alabama, that was used in an activity affecting interstate commerce, in violation of 18 U.S.C. § 844(i). The government, however, proved beyond a reasonable doubt his guilt, including the element that the building had a sufficient nexus to interstate commerce. The district court did not abuse its discretion in denying Morrison's motion for new trial based on newly discovered evidence, or for not holding an evidentiary hearing on that motion, because the evidence at issue was not admissible under Federal Rule of Evidence 608(b) and, thus, not material. Finally, the district court properly calculated Morrison's adjusted offense level, including the enhancement for obstruction of justice because he retaliated against a government witness by threatening him during a post-trial telephone conversation. We AFFIRM.

## I. BACKGROUND

Richard Morrison was indicted for maliciously destroying Bronco Bill's by fire and, through attorney Dwight Reid, entered a plea of not guilty.[1] Reid later withdrew as Morrison's counsel and attorney Neil Hanley entered an appearance as

---

[1] Morrison also was convicted on one count of forfeiture, however, he has abandoned any argument with respect to this conviction by not challenging it on appeal. See United States v. Ford, 270 F.3d 1346, 1347 (11th Cir. 2001) (per curiam).

2

Morrison's counsel. Hanley filed a notice of intent to use the prior convictions of Terry Fredriksen, a government witness, for impeachment purposes. The government objected that because the prior convictions were more than ten years old, they fell outside of the ten-year limitation in Federal Rule of Evidence 609. The district court agreed with the government and held that the convictions were inadmissible under Rule 609.

At trial, the government called, among others, a fire scene responder and investigators; arson experts; the former owner of the property, Rachel Vallas, who previously sold the property to Morrison via a vendor's lien deed; and the Shantazios, who were leasing the property from Morrison at the time of the fire. In defense, Morrison called as witnesses, among others, Dwight Reed, an attorney who had represented him prior the fire in other matters and at the beginning of the criminal trial; and arson expert Charles Butler.

To establish a *prima facie* case of a violation of § 844(i), or arson, the government called Frank Byrd, Captain of the Mobile Fire Department, who testified that his unit responded to a call at 4:32 A.M. on 6 October 2004 regarding an ongoing fire at Bronco Bill's and had to force entry into the building because the doors were locked. Once inside, Byrd heard a loud explosion, felt the fire intensify, and commanded the firefighters to evacuate the burning building.

Shortly thereafter, the roof of the building partially collapsed.

The government also presented the testimony of Samuel Stephens, an investigator for the City of Mobile Fire Department's Bureau of Fire Prevention; Harvey Douglas Cranford, a follow-up investigator with the Mobile Fire Rescue Department; Daniel Hebert, a special agent for the Bureau of Alcohol, Tobacco and Firearms ("ATF") who had been recognized by the International Association of Arson Investigators as the investigator of the year; and R. Harold Deese, a certified fire and explosives investigator, all of whom independently opined that, based on the burn patterns, the fire had been intentionally set using some type of flammable liquid and had not been ignited accidently or by a natural cause. Stephens, Cranford, and Deese believed that the fire originated on the dance floor area, while Hebert concluded that the fire originated elsewhere in the building, since the dance floor had a non-porous surface and there was no damage underneath it. Although forensic tests on three samples taken from the building after the fire tested negative for accelerants, the government witnesses uniformly agreed that the negative results did not prove that a flammable liquid had not been used, considering the amount of time that the fire burned and the amount of water that was pumped into the building.

In order to establish its theory on how the fire had been set, the government

4

elicited from Hebert that it was possible that the burn pattern was consistent with an ignitable liquid being poured from a height, and from Deese that he had investigated arson cases in which a person had poured flammable liquids into the building from a hole in the roof. Hebert and Deese's testimonies were consistent with that of Detective Mark Henderson's testimony that he discovered "several" holes in the south wall of the building, directly above the dance floor area, during his investigation of the fire, and his opinion that these holes, if they existed at the time of the fire, could have been used to introduce ignitable liquid into the building. Doc. 74 at 799-801, 805. These holes were "basically cracks where two boards ha[d] been placed together and then a cover board was placed over them and they ha[d] been pried apart." Id. at 801.

To establish a motive for the crime, the government elicited from Cranford that, during an interview with Morrison around 6:00 P.M. on the day of the fire, Morrison acknowledged that Bronco Bill's was being foreclosed upon at that time because he had missed two monthly payments and was in breach of contract by permitting insurance on the building to lapse. This testimony was later corroborated by two other government witnesses, Rachel Vallas and her nephew and attorney, Pete Vallas. According to Rachel and Pete, Rachel sold the business to Morrison in December 2001 via a vendor's lien deed, but had initiated

5

foreclosure proceedings on the property after she received a worthless check from him in June 2004 and had not received any checks from him for the months of August or September. The foreclosure sale was set for 7 October 2006, the day after the fire, but because of the fire and concerns about insurance coverage, it was postponed.

Rachel also testified that she obtained mortgagee insurance on the property, because Morrison had permitted the insurance on Bronco Bill's to lapse for the second time on 8 August 2004. With respect to the lapsed insurance, Pete testified that, during a telephone conversation with Morrison on 1 October 2004, he mistakenly informed Morrison that Rachel had "reinstated" the insurance policy, when she actually had purchased mortgagee insurance, which was limited to the amount of the vendor's lien and not to the extent of the total loss. Doc. 73 at 558-60, 569-70. After the fire, the insurance company paid her the amount of her vendor's lien and, consequently, Morrison became the fee simple owner of the property.

The government also presented testimony from Shawn Michael Shantazio and his wife, Alicia Shantazio, to prove that the building was used in an activity that affected interstate commerce and that Morrison had the opportunity to commit the crime. Shawn testified that he and Morrison had executed a one-year lease for

6

Bronco Bill's on 7 July 2004, and that he and Alicia were running a restaurant on the property named "Mobile's Pub" at the time of the fire. Id. at 571-72, 574-76, 582-83. Shawn also testified that Morrison had arrived at the restaurant around 1:00 A.M. on 6 October 2004, a few hours before the fire started, wearing dark clothes and boots and had stayed until closing around 1:45 A.M. to 2:00 A.M.. Shawn further testified that he had changed all of the locks on the building in September 2004 without Morrison's knowledge, and there were only four keys to the new locks, one for himself, one for his wife, and one for each of the two bartenders. Shantazio stated that he had locked all of the doors to the building on the night of the fire.

Alicia testified that she personally sold and served Jack Daniel's bourbon, Dewar's scotch whiskey, and Aristocrat vodka to patrons of Mobile's Pub. Amy Gilbert, a manager with the Alabama Beverage Control ("ABC") Board, corroborated Alicia's testimony by stating that, according to ABC receipts, Bronco Bill's had purchased Jack Daniel's bourbon manufactured in Lynchburg, Tennessee, on 26 August 2004; Dewar's scotch whiskey manufactured in Perth, Scotland on 6 August 2004; and Aristocrat vodka manufactured in Bardstown, Kentucky, on 10 September 2004.

To establish opportunity, the government presented the testimony of Emily

Kaye Davis, an employee at a BP gas station in Loxley, Alabama, who testified that Morrison purchased two gallons of gasoline from her between 7:00 P.M. and 7:30 P.M. on 5 October 2004, the night before the fire. Davis admitted that many people were filling gasoline containers at that time, because Hurricane Ivan had recently struck that area on 16 September 2004. Nevertheless, she remember this purchase as unique because Morrison, who was dressed in all black at the time, parked his car on the north side of the building, out of view of the surveillance camera, and walked over to the pumps to fill his gasoline container.

The government also presented the testimony of Robert Cumbie, a social acquaintance of Morrison, who sometimes helped out at the club. Cumbie testified that Morrison had discussed the problems he was having in making the monthly mortgage payment on the Bronco Bill's property, and with the foreclosures of other properties he had owned before he leased Bronco Bill's to the Shantazios. Cumbie also testified that he noticed that Morrison was having problems with his eyes during the spring of 2004. When Cumbie asked about the eye problem, Morrison initially provided one explanation, but later gave a different explanation, specifically, stating that he had hurt his eyes while attempting to burn down the building with gas. This portion of Cumbie's testimony was corroborated by another government witness, Bobby McLemore, who testified that he checked

8

patrons' identifications at the door at Morrison's bar on one particular Thursday and Friday night because, as he later learned from Morrison, Morrison's eyes had been injured while attempting to burn down the building with gas.

The government also called as a witness Terry Fredriksen, who testified that Morrison had requested that she provide him with an alibi, since he had been alone at home on the night of the fire. Based on this request, Fredriksen testified that she initially told ATF agents that Morrison arrived at her house around 1:00 A.M. on the night of the fire, that she went to bed around 3:00 A.M., and that he was not there when she woke up later that morning. Approximately one month later, however, Fredriksen recanted and told the ATF agents that Morrison had not stayed at her house on the night of the fire. The ATF agents requested that Fredriksen secretly record conversations with Morrison to see if he would admit that he burned down Bronco Bill's or that he was not at her home on the night of fire.

The government then played two taped conversations between Fredriksen and Morrison. Morrison never admitted to burning down the building, declaring that he "didn't burn no fucking building,"[2] Doc. 73 at 672, during one

---

[2] In the same conversation, Morrison commented that the agents had not bothered him with further questions because they needed proof "beyond a shadow of a doubt" and that there was "no proof like that. Because it ain't happened." Doc. 73 at 688.

conversation, and "I ain't burned down no fucking building," id. at 683, in another. Morrison also never admitted that he was not at Fredriksen's house on the night of fire and stated during one of the conversations that he had not "had no nobody lie for [him]. I was there at your house and that was that. . . . I come by your house and fell asleep on your couch. And I ain't going to tell it no other way, ever. But that event happened. That's what happened." Id. at 671. He emphasized that "there ain't never going to come a day in life that I'm going to say that I went anywhere other than your house, 'cause that's where I went." Id. at 675. He explained that he did not "even know when [Fredriksen] went to sleep. But [Morrison] fell asleep sitting on the couch." Id. at 676.

In the second conversation, Morrison again maintained that he had not done anything wrong. When Fredriksen explained that she was being pressured by the agents, Morrison responded that he did not understand what his visit to her house had "to do with any of it. You can't verify what I did or didn't do while you went to bed." Id. at 699. He emphasized that he had "stopped by your house and that's as simple as that. I mean, that's the way it is."[3] Id. at 700. He stated that he "didn't burn the place down to start with and they ain't got no evidence I did. And I didn't do it, to begin with . . . they ain't going to prove I did do it, because I

---

[3] When Fredriksen asked Morrison "where were you that night?," Morrison responded that he was "[h]ome. After I went by your house." Doc. 73 at 707.

10

didn't do it."[4] Id. at 699.

The transcript of the conversation indicated, and the government contended, that Morrison stated that he would "have been a whole lot better off if I had lied in another direction. . . . I'd have been better off if I hadn't told some fucking lies."[5] Id. at 662-64, 684. Defense counsel maintained that Morrison actually stated, "I'd have been better of if I had told some of those lies," but Fredriksen disagreed, stating, "That is not the way I took it at all." Doc. 74 at 743.

After the government rested, Morrison moved for an acquittal, arguing that the government did not prove (a) a prima facie case of arson, (b) that he was involved in the fire, or (c) that the building had a substantial impact on interstate commerce.[6] The district court denied the motion.

Morrison's first witness was Dwight Reed, his initial defense attorney, who testified that he had explained to Morrison sometime before the fire that he would

---

[4] Morrison also said "I didn't fucking do it." Doc. 73 at 701. He explained to Fredriksen that the agents were "looking for . . . somebody I told I fucking did it to. And they ain't going to find that, because I ain't fucking done it to start with." Id. at 705. Later in the same conversation, Morrison stated that he "ain't had nothing to do with that fucking fire." Id. at 707.

[5] It is apparent that, based on the arguments made by the government and Morrison's attorney, the transcript of the recordings indicated Morrison used the word "hadn't" rather than "had," see Doc. 73 at 662-64; Doc. 74 at 743, even though the record indicated that he used the word "had" and not "hadn't." See Doc. 73 at 684.

[6] Morrison did not, however, argue that § 844(i) was unconstitutional, that the district court lacked subject matter jurisdiction under the Commerce Clause, or that the district court should consider the Supreme Court's decision in United States v. Lopez, 514 U.S. 549, 115 S. Ct. 1624, (1995), in dealing with constitutional claims under § 844(i).

11

have a statutory right of redemption in which he could redeem the foreclosed property within one year of the foreclosure. Morrison also called Charles Butler, a retired fire investigator for the Mobile Police Department, as a witness. Butler testified that the "burn patterns [were] absolutely useless," because distortions to the patterns would have occurred when items were falling to the ground during the fire. Doc. 75 at 952. Butler opined that, based on the fire's origin, which he contended was around the patron area where booths were located, approximately five to six feet away from the dance floor area, a smoldering cigarette dropped from one of the booths, not arson, caused the fire. Butler further testified that it was "not conceivable" that someone could drill a hole in the roof and drop an ignitor to start a fire and, moreover, he found nothing to support such a theory during his investigation. Id. at 987. Butler admitted that the negative test results did not prove that no accelerant was present, and that, even if a cigarette had burned down the building, he could not discount the possibility that Morrison was the person who dropped the cigarette onto the floor. Butler also admitted that only four of the one thousand fires he had investigated previously were definitely caused by a cigarette. Morrison then moved for a renewed judgment of acquittal on the same grounds as before, and the district court again denied the motion. Morrison was subsequently found guilty by the jury as charged.

12

Morrison's counsel also filed a motion for a new trial based on newly discovered evidence. Counsel recounted that his request to use Fredriksen's prior convictions for impeachment was denied. He stated that, within two weeks of filing the motion, he had learned that, at the time of her testimony as a "key prosecution witness," Fredriksen "was under investigation by the Drug Enforcement Administration and the United States Attorney Office for the Southern District of Alabama for major drug crimes," including the distribution of "large amounts of methamphetamine, 'ice,' MDMA or ecstacy, and marijuana." Doc. 49 at 1, 2. Counsel also alleged that the United States Attorney's Office possessed documents relating to Fredriksen's criminal activities in relation to six named defendants. The district court denied the motion because Morrison failed to establish that he exercised diligence in discovering the evidence, since the motion was silent as to precisely when he learned of the investigation against Fredriksen; the evidence, at best, would have been used for impeachment purposes; and the evidence would not have resulted in an acquittal, since it was inadmissible under Fed. R. Evid. 608, and, thus, not material. Morrison's motion for reconsideration and for production of documents, which argued that the information could be used to impeach Fredriksen's credibility under Fed. R. Evid. 608, was also denied.

The probation officer assigned Morrison a base offense level of 24, and

13

recommended a two-level enhancement for obstruction of justice for threatening, intimidating, or otherwise unlawfully influencing a witness because Morrison had contacted and threatened a government witness who had discredited Morrison's alibi on the night of the fire. With an adjusted offense level at 26 and a criminal history category of I, Morrison faced a Guidelines sentencing range of 63-78 months in prison. Morrison filed written objections to the presentence investigation and argued, in part, that an obstruction of justice enhancement recommendation was not warranted.

At the sentencing hearing, Morrison renewed his written objections, arguing that the obstruction of justice enhancement was inapplicable because he could not have had the specific intent to obstruct justice when he allegedly contacted the government witness as the trial had already concluded and the witness had already testified. In response to this objection, the government presented the testimony of Cumbie who testified, in part, that Morrison telephoned him on the night after the verdict was rendered and "threatened [his] life a couple of times" because Cumbie "didn't have to say what I said" and, in Morrison's words, "friends don't do friends that way." Doc. 1049-50, 1083-85, 1087-88.

The government also argued that the obstruction of justice enhancement was justified because Cumbie could have been called as a sentencing witness with

14

respect to other outstanding issues. The government also argued that the enhancement was warranted based on Fredriksen's testimony that Morrison asked her to provide him with a false alibi on the night of the fire. Morrison responded by presenting the testimony of his ex-wife, Melissa Morrison, who stated that she overheard the conversation at issue, and that Morrison never threatened Cumbie.[7]

The district court concluded that the obstruction of justice enhancement was warranted because Morrison's telephonic threat was in retaliation of Cumbie testifying against him, a violation of 18 U.S.C. § 1513 and a proper reason under § 3C1.1 for applying the enhancement. The district court stated that it had "considered the statutory purposes of sentencing and . . . the sentencing guidelines," found that the guidelines provide for an appropriate sentence under the circumstances, and that the sentence that he intended to impose was "otherwise reasonable under the statutory provisions of sentencing." Id. at 1107. Morrison was then sentenced to a term of 78 months in prison based on an adjusted offense level of 26 and a criminal history category of I.[8]

On appeal, Morrison raises four issues: (1) whether the evidence at trial

---

[7] Morrison was at his ex-wife's home at the time of this telephone call, attending what he had hoped would be a "victory party," and had the telephone conversation on a speaker phone with a number of people in the same room. Doc. 76 at 1097-1100.

[8] Morrison was remanded into custody and reported to the Federal Correctional Institution in Oakdale, Louisiana on 8 May 2006.

proved beyond a reasonable doubt that he maliciously destroyed a building by fire; (2) whether the trial evidence sufficiently showed that the burned building had an effect on interstate commerce; (3) whether the district court abused its discretion by denying his motion for a new trial based on newly discovered evidence without holding an evidentiary hearing; and (4) whether the district court clearly erred at sentencing by enhancing his base offense level for an obstruction of justice.

## II. DISCUSSION

A. <u>Proof of Morrison's malicious destruction of a building by means of a fire</u>

Morrison argues that there was insufficient evidence to prove his guilt beyond a reasonable doubt for violating § 844(i). He contends that the government did not proffer any direct evidence of his guilt, and its circumstantial evidence–that a foreclosure sale was set for the day after the fire; that he purchased gas the day before the fire; and that Fredriksen testified that she provided him with a false alibi--was inadequate to convict him for this substantive crime, especially considering that, because the Shantazios had changed all of the locks to the building, he was unable to enter the building at the time of the fire. He notes that he repeatedly told Fredriksen during the taped conversations that he did not set the fire; that, although he purchased gasoline on the day before the fire, Hurricane Ivan recently had struck; that his attorney had informed him before the fire that he had a

16

right of redemption for one year after the foreclosure; and that the government was unable to find ignitable liquids on the building samples taken after the fire.

A defendant's motion for a judgment of acquittal following the government's case and renewal of this motion at the close of all of the evidence will properly preserve the challenge to the sufficiency of the evidence on appeal. Clark v. United States, 293 F.2d 445, 448 (5th Cir. 1961). We review a properly preserved sufficiency of the evidence claim de novo. United States v. McDowell, 250 F.3d 1354, 1361 (11th Cir. 2001).

In determining whether the evidence is sufficient to support a conviction, we view the evidence in the light most favorable to the government and decides whether a reasonable juror could have reached a conclusion of guilt beyond a reasonable doubt. United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir.1997). We resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict, United States v. Starke, 62 F.3d 1374, 1380 (11th Cir. 1995), whether the evidence is direct or circumstantial. United States v. Awan, 966 F.2d 1415, 1434 (11th Cir. 1992).

To support a conviction under 18 U.S.C. § 844(i), the government must establish, among other elements, that a defendant (1) maliciously damaged or destroyed; (2) by means of a fire or an explosive; (3) a building, vehicle, or other

17

real or personal property.[9]  Although § 844(i) does not define the term "maliciously," several circuits have specifically held that, based on common law and the legislative history of the statute, the term includes acts done "intentionally or with willful disregard of the likelihood that damage or injury would result."  See United States v. Wiktor, 146 F.3d 815, 818 (10th Cir. 1998) (per curiam) (citing supporting decisions from several sister circuits; citations and quotation marks omitted).

The government presented sufficient evidence at trial to support the conclusion that Morrison maliciously destroyed Bronco Bill's by means of a fire. The government proffered four independent experts, Stephens, Cranford, Herbert, and Deese, all of whom opined that, based on the particular burn patterns, the fire was intentionally set.  Although the government did not produce any direct evidence tying Morrison to the arson, it produced sufficient circumstantial evidence for a reasonable juror to find guilt beyond a reasonable doubt on the substantive count.  Calderon, 127 F.3d at 1324.  Specifically, the government established a possible motive for the arson.  Morrison, whose financial difficulties had culminated in the foreclosure of certain properties and a foreclosure sale on

---

[9] The government must also establish a fourth element, namely that the building, vehicle, or other real or personal property was used in interstate or foreign commerce or in an activity affecting interstate or foreign commerce.  18 U.S.C. § 844(i).  This element is separately discussed.

Bronco Bill's set for the day after the fire, had been mistakenly informed by attorney Pete Vallas sometime before the fire that the building was fully covered by insurance, of which Morrison would have been entitled to a share of the proceeds. The government also proved that, once the insurance company satisfied Rachel Vallas's vendor's lien, Morrison became the fee simple owner of the property as a result of the fire.

Additionally, the government showed that Morrison had the opportunity to commit the crime. The government presented the testimony of Davis, the BP employee, who testified that Morrison purchased two gallons of gasoline, an ignitable liquid, on the night before the fire and, in doing so, parked his automobile away from the gasoline pumps and out of view of the surveillance camera. The government introduced the Shantazios's testimony that Morrison was at Bronco Bill's in the early morning hours on the day of the fire. Even though Morrison did not have a key to the building, the government introduced two expert witnesses, Herbert and Deese, who respectively testified that it was possible that the burn pattern was consistent with an ignitable liquid being poured from a height, and that it was possible for an arsonist to introduce an accelerant into the building from the outside. Their testimony corroborated the government's theory in the case, based on Detective Henderson's findings at the fire scene, that Morrison introduced an

accelerant from the outside through one of the holes in the wall of the south side of the building, directly above the dance floor area where two of the government's expert witnesses opined that the fire began. Although Henderson could not definitively conclude that the holes existed before the fire, a reasonable juror could have believed that they did, and that Morrison set the fire by pouring a flammable liquid into the building through these holes. The government also established through two witnesses, Cumbie and McLemore, that Morrison had attempted to burn down the building at least once before. Finally, the government established that Morrison attempted to conceal the crime through Fredriksen's testimony that, based on Morrison's request to do so, she initially provided a false alibi for him for the night of the fire since he had been alone at home on that night.

Based on all of this evidence, a reasonable juror could have concluded beyond a reasonable doubt that Morrison maliciously destroyed by means of a fire Bronco Bill's. Because the government presented sufficient evidence that the burned down building had an effect on interstate commerce, as discussed in the following issue, the government established a violation of § 844(i). Sufficient evidence supports Morrison's conviction on this substantive count.

B. Sufficient evidence of an effect on interstate commerce

Morrison argues that the government did not present sufficient evidence that

Bronco Bill's had a substantial effect on interstate commerce, as required by § 844(i), especially in light of United States v. Lopez, 514 U.S. 549, 115 S. Ct. 1624 (1995),[10] and United States v. Denalli, 73 F.3d 328 (11th Cir.) (per curiam), modified on other grounds, 90 F.3d 444 (11th Cir. 1996) (per curiam).  Morrison contends that Lopez limited Congress's commerce powers and that Denalli required the nexus of a substantial impact to support a conviction under this statute.  Morrison argues that the government's evidence to prove this element–testimony from an ABC employee that Bronco Bill's had purchased premium liquors manufactured out of state–was insufficient to establish the requisite interstate commerce nexus.

As an initial matter, Morrison frames his issue as one of sufficiency of the evidence, and he does not squarely raise a constitutional issue with respect to 18 U.S.C. § 844(i).  Therefore, he only asserts a statutory claim with respect to this statute.[11]

---

[10]Morrison's reliance on Lopez is misplaced.  Lopez involved a constitutional and not a statutory claim and  construed a statute other than § 844(i).

[11] To the extent that Morrison raises both constitutional and statutory claims with respect to § 844(i), see United States v. Dascenzo, 152 F.3d 1300, 1301 n.3 (11th Cir. 1998), the constitutional claim is subject to plain error review since it was not raised below, see United States v. Taylor, 417 F.3d 1176, 1183 (11th Cir.) (per curiam), cert. denied, _ U.S. _, 126 S. Ct. 768 (2005), and  fails as we have rejected facial challenges to § 844(i).  See United States v. Grimes, 142 F.3d 1342, 1346 (11th Cir. 1998).  The statute is constitutional as applied to Morrison because the government proved that the interstate commerce nexus was satisfied under the standards established in Russell v. United States, 471 U.S. 858, 105 S.Ct. 2455 (1985), and other cases construing § 844(i).  See

We review de novo a district court's denial of a motion for judgment of acquittal based on sufficiency of the evidence. United States v. Williams, 144 F.3d 1397, 1401 (11th Cir. 1998). Section § 844(i) makes it illegal to burn "any . . . property used in interstate . . . commerce or in any activity affecting interstate . . . commerce." The act was promulgated to protect "[n]early all type of property" that is "used in or affects interstate commerce." United States v. Miller, 24 F.3d 1357, 1360-61 (11th Cir. 1994).

The Supreme Court initially construed the present version of this statute in Russell v. United States, 471 U.S. 858, 105 S. Ct. 2455 (1985). In Russell, the Court held that a two-unit apartment building that was used as rental property fell within the ambit of § 844(i) and that the statute's legislative history "suggest[ed] that Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home." Id. at 862, 105 S. Ct. at 2457. The Court also wrote that:

> By its terms, however, [§ 844(i)] only applies to property that is 'used' in an 'activity' that affects commerce. The rental of real estate is unquestionably such an activity. . . . [T]he local rental . . . is merely an element of a much broader commercial market in rental properties. The congressional power to regulate the class of activities that constitute that rental market for real estate includes the power to regulate individual activity within that class.

Grimes, 142 F.3d at 1346-47.

22

Id. (footnotes omitted).

Following Russell, we used various standards in analyzing the interstate commerce nexus of § 844(i)–some of which were more stringent than others–and, in fact, once specifically held that a "case-by-case inquiry" was necessary because "[p]recise formulations of the requisite interstate commerce nexus are not possible." United States v. Chowdhury, 118 F.3d 742, 745-46 (11th Cir. 1997) (per curiam); see e.g., United States v. Chisholm, 105 F.3d 1357, 1358 (11th Cir. 1997) (per curiam) (recognizing various tests articulated by this court); Belflower v. United States, 129 F.3d 1459, 1462, n.4 (11th Cir. 1997) (per curiam) (acknowledging that "some degree of tension may exist" if Denalli was interpreted to require "the government to prove in each case a substantial effect on interstate commerce").

In Denalli, we recognized a "substantial nexus" test, 73 F.3d at 329-30, while in United States v. Utter, 97 F.3d 509, 516 (11th Cir. 1996), we determined that the building had an "apparent" effect on interstate commerce. See also Chowdhury, 118 F.3d 745-46 (utilizing the "apparent" effect standard and noting that a later pronouncement by the Supreme Court did not call into question the conclusion in Russell "that the federal arson statute invariably protects business property," and therefore Russell remained "authoritative precedent").

23

In another case, we opined that § 844(i) may only require a minimal nexus to interstate commerce. See United States v. Viscome, 144 F.3d 1365, n.9 (11th Cir. 1998) ("If this court were not bound by Denalli, the government makes a strong argument that the second prong of § 844(i) requires no more than its language indicates: namely, that the property at issue be used in 'any activity affecting interstate or foreign commerce.' Even a minimal effect on interstate commerce, therefore, would be sufficient"); cf. United States v. McAllister, 77 F.3d 387, 389-90 (11th Cir. 1996) (concluding that a defendant could be convicted under 18 U.S.C. § 922(g)(1)–a statute that prohibited felons from possessing "in or affecting commerce, any firearm or ammunition"–if the government proved that the weapon in question had a "minimal nexus" to interstate commerce, rather than a "substantial nexus," since § 922(g)(1) contained a jurisdictional element, like § 844(i)).

We also have articulated an "aggregate" approach. See Chowdhury, 118 F.3d at 745 (discussing that in "a case concerning the destruction of business property, when considered in the aggregate, would have a substantial effect on interstate commerce because business property will almost invariably be an element of a much broader commercial market"); Viscome, 144 F.3d at 1368 ("[S]ubsequent to the Denalli decision involving a private residence, . . . if business

24

property is involved, then the property need only have been used in an activity that in the aggregate has a substantial effect on interstate commerce."); Dascenzo, 152 F.3d at 1303 ("Aggregation of the effects on commerce of a given activity (such as, the renting of property) to determine whether a substantial effect on commerce exists is an approach to Commerce Clause legislation recognized by the Supreme Court."); cf. Belflower, 129 F.3d at 1459, 1462  (holding that, in the context of a § 2255 motion, the government satisfied the nexus requirement by showing that activities, in the aggregate, affected interstate commerce).

Following our interpretations, the Supreme Court issued two decisions that impacted the analysis of the interstate commerce nexus under § 844(i).  First, in Jones v. United States, 529 U.S. 848, 855, 120 S. Ct. 1904, 1910 (2000), the Supreme Court held that the government was required to prove that the burned down building had been actively–as opposed to passively–employed in interstate commerce in order to establish a violation of § 844(i).   Second, in United States v. Morrison, 529 U.S. 598, 613, 617, 120 S. Ct. 1740, 1751, 1754 (2000), the Supreme Court struck down as unconstitutional 42 U.S.C. § 13981, a provision of the Violence Against Women's Act that provided a federal civil remedy for victims of gender-motivated violence,  and "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's

aggregate effect on interstate commerce."

Following the Jones and Morrison decisions, courts began reevaluating decisions construing § 844(i), and some of them concluded that these two Supreme Court decisions undermined, if not implicitly abrogated, certain decisions. In United States v. Odom, 252 F.3d 1289, 1297 (11th Cir. 2001) (citation omitted), we noted that the Morrison opinion called into doubt our suggestion in Dascenzo that "only a 'minimal effect on interstate commerce' was required under § 844 so long as the effect of arson on the particular type of property had an aggregate effect on interstate commerce." See also United States v. Tush, 151 F. Supp. 2d 1246, 1248-49 (D. Kan. 2001) (concluding that the Utter decision was abrogated by Jones, since it relied on a passive connection, rather than an active connection, to interstate commerce).

As a result, in Odom, we utilized the substantial nexus standard and commented that the government needed to prove more than a "nominal" connection to interstate commerce, or else the distinction between national and local authority would be "completely obliterate[d]" as though "no jurisdictional requirement existed at all." 252 F.3d at 1296 (citation omitted). Citing Jones, we identified three factors to consider in determining whether damage or destruction of a building is properly prosecutable under § 844(i), specifically: (1) the function

26

of the building; (2) whether that function is involved in commerce; and (3) whether the commerce in which the building is involved sufficiently affects interstate commerce.  Id. at 1294.

With respect to the parameters of the requisite interstate commerce nexus under § 844(i), we have affirmed a conviction under § 844(i) on a showing that the burned down public restaurant in question catered to interstate travelers and served alcohol and used natural gas, both of which originated out of state, see Utter, 97 F.3d at 516; determined that the nexus was satisfied where the burned down building was a commercial building in which the defendant rented his restaurant space, where he purchased products from out-of-state manufacturers, and where the restaurant, had it opened, would have been a public restaurant available to interstate travelers, see Chowdhury, 118 F.3d at 745-46; and affirmed a defendant's conviction under § 844(i) after concluding that the government satisfied the interstate commerce nexus requirement through its proof that the truck in question was "the subject of an interstate lease" at the time of its attempted bombing and, thus, was "a tangible component of interstate commerce," see Viscome, 144 F.3d at 1369.

We have also, however, that the § 844(i) interstate commerce nexus is not satisfied where the government's only evidence to establish the requisite interstate

27

commerce nexus was that the owner of the burned down house occasionally produced memoranda on his home computer, which he then printed off and hand-delivered to his co-workers at his place of employment, a corporation that engaged in international business, see Denalli, 73 F.3d at 329-31, and to show that the church at issue "was used in or affected interstate commerce" was evidence that the church received donations from a few out-of-state donors; utilized some Bibles and prayer books that had been purchased from an out-of-state distributor; obtained natural gas from an out-of-state vendor; and indirectly contributed to an out-of-state church organization through its membership in the in-state church organization, see Odom, 252 F.3d at 1296-97, 1299.

In this case, the government submitted sufficient evidence to prove that Bronco Bill's had an effect on interstate commerce, as required by § 844(i), regardless of which standard is applied. The function of Bronco Bill's or Mobile's Pub at the time of the fire was a commercial restaurant and bar business, which was located on property that was being rented by owners of the restaurant from Morrison, the actual owner of the property. See Odom, 252 F.3d at 1294.

While the government's evidence that the restaurant purchased various alcohols from out-of-state distributors and possibly catered to out-of-state patrons may have been sufficient standing alone to establish the interstate commerce

28

nexus, the fact that the property was rental real estate "unquestionably" demonstrated that the building was actively employed in, and had a substantial effect on an activity involving interstate commerce, and, thus, was covered by § 844(i).  Russell, 471 U.S. at 862, 105 S. Ct. at 2457.  The government proffered sufficient evidence to establish the requisite interstate commerce nexus under § 844(i), and proved Morrison's guilt beyond a reasonable doubt as to all of the other elements of this statute.

C.  Denial of Morrison's motion for a new trial without an evidentiary hearing

Morrison argues that the district court abused its discretion by denying his motion for a new trial based on newly discovered evidence, information that Fredriksen was under investigation for major drug crimes, without holding an evidentiary hearing on the matter.  Morrison contends that Fredriksen was the government's strongest witness and that other witness testimony regarding her drug dealing would have significantly impacted the outcome of the trial and could have produced an acquittal.  Morrison also argues that it was disingenuous to assert that he possessed the information at the time of trial, since he noted in his motion for a new trial that he had recently learned of it.  He also maintains that the information was relevant and that the district court should have at least considered an *in camera* review of the documents because the government did not deny their

existence.

We review the district court's denial of a motion for a new trial based on newly discovered evidence for abuse of discretion. United States v. Noriega, 117 F.3d 1206, 1217 (11th Cir. 1997). Further, "[t]he decision of the trial court not to hold [an evidentiary] hearing is within the trial court's sound discretion, subject to review only for an abuse of that discretion." United States v. Schlei, 122 F.3d 944, 990 (11th Cir. 1997) (citation omitted).

Federal Rule of Criminal Procedure 33 permits a defendant to file for a new trial based on newly discovered evidence, and "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a), (b)(1). We have stated that a motion for a new trial on newly discovered evidence is "highly disfavored" and "should be granted only with great caution." United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc).

A new trial based on newly discovered evidence is warranted only if: "'(1) the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a different result.'" United States v. Thompson, 422 F.3d 1285, 1294 (11th Cir. 2005) (citation omitted). "'The

30

failure to satisfy any one of these elements is fatal to a motion for a new trial.'" Id. (citation omitted).

Undisclosed exculpatory "evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the proceeding would have been different.'" Strickler v. Greene, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948 (1999) (citation omitted). Although inadmissable evidence is generally not material, it may be material if it leads to admissible evidence that would have resulted in a different outcome at trial. See generally Wright v. Hopper, 169 F.3d 695, 703-04 n.1 (11th Cir. 1999).

According to Fed. R. Evid. 608(b):

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime[,] . . . may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed. R. Evid. 608(b).

The district court did not abuse its discretion in denying Morrison's motion for a new trial or by not holding an evidentiary hearing on it. First, while Morrison argues on appeal that he discovered the evidence shortly after trial, he does not

31

contest the district court's finding that there was insufficient evidence that he exercised due care and diligence in obtaining the information. Thus, he has arguably waived this issue on appeal. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir.1989) (deeming issues not argued on appeal waived, and noting that a passing reference on appeal to the issue was insufficient to properly raise it). Moreover, the newly discovered evidence–information that Fredriksen was under investigation for major drug crimes–is inadmissible under Rule 608(b) and would have led to no admissible evidence. It was, thus, not material.

Finally, although Morrison argued on reconsideration that the evidence could have been used to impeach Fredriksen's credibility, impeachment is not a proper justification for granting a new trial based on newly discovered evidence. See Thompson, 422 F.3d at 1294 (noting that a new trial based on newly discovered evidence is not warranted if the evidence was merely "impeaching").

D. Enhancement of Morrison's base offense level for obstruction of justice

Morrison argues that the district court clearly erred by enhancing his base offense level for obstruction of justice on a finding that he threatened a witness after the conclusion of the trial. He maintains that the government did not show, and could not have shown, that he had the specific intent to obstruct justice, since

32

the jury had already returned its verdict when the alleged threat was made.

We review the district court's factual findings, including the determination of whether to apply an obstruction of enhancement under the guidelines, for clear error and its application of the sentencing guidelines to the facts de novo. United States v. Rubio, 317 F.3d 1240, 1244 (11th Cir. 2003).

United States Sentencing Guidelines § 3C1.1 provides for a two-level sentence enhancement:

> [i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . . .

According to this provision's commentary, the enhancement applies if the defendant's obstructive conduct, which can include the threatening of a witness, "occurred during the course of . . . sentencing of the defendant's instant offense of conviction." USSG § 3C1.1, comment. (n.1(A) & 4(a)). The enhancement applies if the defendant's conduct is prohibited by the obstruction of justice provisions of Title 18. Id. at comment. (n.4(i)). Title 18 § 1513(b) prohibits a person from threatening to inflict bodily injury on a witness with the intent to retaliate against that witness. When a defendant challenges a factual base for his sentence, "[t]he [g]overnment has the burden of proving the applicability of a guideline section

33

which would enhance a defendant's offense level . . . by a preponderance of the evidence . . . with 'reliable and specific evidence.' " United States v. Cataldo, 171 F.3d 1316, 1321 (11th Cir. 1999) (citation omitted).

The probation officer recommended the obstruction of justice enhancement on the basis that Morrison violated § 3C1.1 by threatening, intimidating, or otherwise unlawfully influencing a witness. In support of that recommendation, the government adduced at the sentencing hearing from Robert Cumbie, a government witness during Morrison's trial, that Morrison contacted him by telephone shortly after the verdict was rendered and threatened to kill him because, according to Morrison, "friends don't do friends that way." Doc. 76 at 1084-85.

The district court did not clearly err in enhancing Morrison's base offense level for obstruction of justice on a determination that the telephonic threat against Cumbie was in retaliation of him testifying against Morrison at trial that was a proper justification for applying the obstruction of justice enhancement. Cf. Rubio, 317 F.3d at 1242, 1244-45 (affirming the district court's application of the obstruction of justice enhancement where the defendant retaliated against a witness after trial, in violation of 18 U.S.C. § 1513(b)).

### III. CONCLUSION

Morrison challenges his conviction and sentence for one count of

34

maliciously destroying by means of a fire a building that was used in an activity affecting interstate commerce. Because the government proved his guilt on this count and the building's nexus to interstate commerce beyond a reasonable doubt, we **AFFIRM** his conviction. We **AFFIRM** the district court's denial of Morrison's motion for a new trial based on newly discovered evidence or without holding an evidentiary hearing because the evidence was not admissible or material. We also **AFFIRM** his sentence. The district court properly calculated his adjusted offense level, including an enhancement for obstruction of justice, because Morrison retaliated against a government witness by threatening him during a post-trial telephone conversation.

**AFFIRMED.**