[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 15, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-13422
Non-Argument Calendar

_____

D. C. Docket No. 04-80125-CR-JIC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GREGG M. PALEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 15, 2006)

Before TJOFLAT, CARNES and HULL, Circuit Judges.

PER CURIAM:

Gregg Paley pleaded guilty to misprision of a felony in violation of 18

U.S.C. § 4 and was given an 18-month sentence. Paley was involved in laundering the proceeds of a friend's drug sales in violation of 18 U.S.C. § 1956(a)(1)(B)(i). One of his laundering schemes was an investment in the stock of a privately-held company, and the stock appreciated significantly in value. The district court, in calculating the total amount of the laundered funds for which Paley was accountable under United States Sentencing Guidelines § 2S1.1 (Nov. 2004), included the appreciated value of the stock, instead of just the initial investment amount. We reverse.

## I.

Paley, an attorney in Boca Raton, Florida, and drug dealer Brian Rowland, engaged in two separate money laundering transactions. First, they bought a fishing boat together for $120,000. Rowland contributed $60,000 of his drug proceeds towards the purchase price, and Paley financed his $60,000 contribution. Paley was listed as the sole owner on the vessel's title. Paley concedes that he should be held responsible for laundering Rowland's $60,000.

Second, Paley and Rowland invested $20,000 in the stock of a private company that was one of Paley's legal clients. Rowland contributed $15,000 of that amount, with Paley contributing the remaining $5,000. The company eventually repurchased Paley and Rowland's shares for $120,000. Paley issued

Rowland a check for $103,000 for his share of the investment. It is not clear from the record why Rowland, who had supplied 75 percent of the initial investment, received 89 percent of the proceeds. In any event, Rowland then rewarded Paley for investing his drug proceeds in such a lucrative asset by paying him an additional $40,000.

Paley's position is that for sentencing guidelines purposes he should be held responsible for the $15,000 initial investment by Rowland, the $40,000 that Rowland paid him, and the $60,000 that Rowland contributed to buying the boat, which adds up to $115,000. He should not, he insists, be held responsible for the $88,000 appreciation in value of Rowland's share of the investment ($103,000 proceeds minus $15,000 purchase price).

## II.

In deciding this issue we have to consult four guidelines provisions. We begin with U.S.S.G. § 2X4.1, which provides that the base offense level for misprision of a felony is nine levels lower than the offense level for the underlying offense. The offense underlying Paley's misprision conviction is money laundering, which is covered by U.S.S.G. § 2S1.1. Because Paley was only involved in laundering money and not in the substantive drug offense that generated the money to be laundered, subsection (a)(2) of that section applies. See

3

U.S.S.G. §§ 2S1.1(a)(1)–(2). That provision specifies that the base offense level

for Paley's crime is eight plus the number of offense levels corresponding to the

"value of the laundered funds" as provided by the table in § 2B1.1. Id. §

2S1.1(a)(2). The table sets the base offense level for various property offenses

such as theft and forgery according to the amount of loss. Id. § 2B1.1(b)(1). That

is where the amount of the appreciation in the value of the investment comes in.

Finally, because Paley knew the laundered funds were drug proceeds, §

2S1.1(b)(1) applies to add six offense levels.

The graduated table in § 2B1.1 provides that the offense level for

$163,000—the number which includes the full amount of the stock's

appreciation—is ten. Id. § 2B1.1(b)(1)(F) (applying to a loss of more than

$120,000 but not more than $200,000). Add to that the base offense level of eight

as directed by § 2S1.1(a)(2) and the six offense levels provided in § 2S1.1(b)(1)

and then subtract nine levels per § 2X4.1, and you get an offense level of 15. With

a criminal history category of I, the resulting sentencing range is 18 to 24 months.

That is the guidelines calculation the presentence investigation report used, and the

district court adopted it after overruling Paley's objection to the amount of the

laundered funds. The district court sentenced Paley to 18 months, the bottom end

of the guidelines range.

If Paley is correct that he should have been held responsible for only $115,000, the guidelines range drops six months on both ends. The table in § 2B1.1 provides that the base offense level for $115,000 is eight. See id. § 2B1.1(b)(1)(E) (applying to a loss of more than $70,000 but not more than $120,000). Therefore, the total offense level would have been 13, and the resulting sentencing range should have been just 12 to 18 months.

### III.

We review the district court's determination of the facts concerning the amount of money involved in a money laundering scheme only for clear error. United States v. Martin, 320 F.3d 1223, 1225 (11th Cir. 2003). We review the district court's interpretation of the sentencing guidelines de novo. Id. Because Paley preserved this issue by timely objection in the district court, if there was error we will reverse unless it was harmless. United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005).

### A.

Our holding in United States v. Barrios, 993 F.2d 1522 (11th Cir. 1993), persuaded the district court to include the appreciation in value of the stock in its calculation of the "value of the laundered funds" as required by § 2S1.1(a)(2). Barrios involved the application of § 2S1.1 before its amendment in 2001. In that

case, the defendant Barrios sent $595,000 of his drug proceeds to Jose Nasser who deposited the funds in bank accounts in three countries. Id. at 1523–24. Some time later, Nasser issued ten checks totaling nearly $675,000 to Barrios, who then gave them to Nicholas Cure to deposit in an offshore bank. Id. at 1523. Barrios argued that he should be held responsible only for the initial deposit of $595,000, and not for the $675,000 amount, which included nearly $80,000 in interest earned while the funds were on deposit with the banks. Id. at 1523–24.

The pre-2001 amendment version of § 2S1.1 contained a graduated table that provided for an increase in the base offense level if the "value of the funds exceeded $100,000." E.g., U.S.S.G. § 2S1.1(b)(2) (Nov. 1992). Of importance for Barrios was that $600,000 was the break point between applying a four level enhancement or a three level enhancement. See id. § 2S1.1(b)(2)(E). The district court in Barrios included the $80,000 in interest earned on the drug proceeds in calculating the value of the funds pursuant to the former § 2S1.1(b)(2). 993 F.2d at 1524. This Court affirmed. Id.

In doing so, we focused on the meaning of the term "funds." See id. We noted that a district court is "'required to consider the total amount of funds that it believed was involved in the course of criminal conduct.'" Id. (quoting United States v. De La Rosa, 922 F.2d 675, 679 (11th Cir. 1991) (reviewing for clear error

district court's determination of the amount of money involved in a money laundering operation)). We also agreed with the Tenth Circuit that "funds" "'obviously refer[s] to funds that are used by the defendant in an unlawful monetary transaction.'" Id. (quoting United States v. Johnson, 971 F.2d 562, 575 (10th Cir. 1992)).

Our holding in Barrios that the interest was properly included in the "value of the funds" turned on the fact that "whatever interest was earned on the original drug proceeds . . . stayed with the funds throughout the remainder of the laundering process." Id. In short, the interest "became part of Barrios' continuing money laundering scheme." Id. We rejected Barrios' argument that including the interest "distort[ed] the magnitude of the criminal enterprise involved" because "including interest in this case gave an accurate reflection of the size of the money laundering scheme." Id. at 1525. Finally, we stated that the public policy against money laundering was furthered by including the interest "where that interest was combined with funds which thereafter continued through laundering transactions." Id.

The district court in the present case thought that under our 1993 decision in Barrios the return earned on criminally derived funds must be counted as part of the funds involved in money laundering. In 2001, however, § 2S1.1 was amended.

7

The amended version, which applies in this case, no longer uses "the value of the funds" as a specific offense characteristic. Instead, § 2S1.1 now provides that the "value of the <u>laundered</u> funds" should be used in determining the offense level. U.S.S.G. § 2S1.1(a)(2) (Nov. 2004) (emphasis added). The commentary to the amended provision defines "laundered funds" as follows: "Laundered funds means the property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of" the money laundering statute. U.S.S.G. § 2S1.1 cmt. n.1.

In <u>United States v. Martin</u>, 320 F.3d 1223 (11th Cir. 2003), we recognized that the change from "value of the funds" at issue in <u>Barrios</u> to "value of the laundered funds" in the revised § 2S1.1 could affect the money laundering calculation. In that case, the defendant, Martin, deposited a stolen check totaling just over $380,000 into an attorney trust account that he maintained. <u>Martin</u>, 320 F.3d at 1225. A few days later he wrote nine separate checks totaling about the same amount and then used those checks to obtain cash or to purchase cashier's checks and certificates of deposit for his family, friends, and others. <u>Id.</u> In total, Martin engaged in 97 separate transactions totaling over one million dollars. <u>Id.</u> In calculating Martin's sentence under the former § 2S1.1, the district court used the total amount instead of the $380,000 from the initial stolen check. <u>Id.</u>

8

Relying on <u>Barrios</u>, this Court rejected Martin's argument that "the 'value of the funds' necessarily means the amount of money originally injected or infused into the money laundering scheme.'" <u>Id.</u> at 1226.  We held that "[b]y adding together the individual transactions for which [Martin] was convicted, the district court's calculation accurately reflected the scope of the criminal enterprise because each of the 97 money laundering counts constituted a separate harm to society by further impeding law enforcement's efforts to track the ill-gotten gains." <u>Id.</u> at 1227.

The present case is distinguishable from <u>Martin</u> and <u>Barrios</u> because both of those cases involved the old version of § 2S1.1, not the amended version. We specifically recognized in our <u>Martin</u> opinion that "[g]iven the substantial changes to the money laundering provisions, our holding today does not apply to the 'value of the laundered funds' in § 2S1.1(a)(2) of the 2001 Guidelines." <u>Id.</u> at 1227 n.3. Because, as we recognized in <u>Martin</u>, the 2001 revisions to § 2S1.1 changed the relevant term for sentence calculation purposes from "the value of the funds" to "the value of the laundered funds," we must interpret the latter phrase, something that neither <u>Barrios</u> nor <u>Martin</u> do.

B.

"Laundered funds" as used in § 2S1.1(a)(2) include "the property, funds, or

9

monetary instrument involved in the [money laundering] transaction." U.S.S.G. § 2S1.1 cmt. n.1. This case involves funds and property, the property being the stock that was purchased with funds and then appreciated significantly in value. For two reasons we are persuaded that the "laundered funds" should not include the stock's appreciation in value.

First, the inclusion of the modifier "laundered" before "funds" indicates that the funds which should be considered for sentencing purposes are those that were actually laundered. In the stock scheme at issue in this case, the funds that were laundered by Paley are the $15,000 that Rowland contributed toward the stock investment. The appreciation of Rowland's share of the investment to $103,000 may have been merely fortuitous or may have resulted from Paley's investment acumen, but it was not the product of the money laundering scheme itself. It did not convert those funds to laundered funds.

Second, if we were to hold that the value of the laundered funds included the appreciation in value of an asset purchased with drug proceeds, we would open the door to an absurd result when laundered funds are used to purchase an asset that ultimately decreases in value. It would be unsound policy to interpret "value of the laundered funds" in § 2S1.1(a)(2) in a way that would make the sentence in a money laundering case (or misprision case where the underlying offense is money

10

laundering) hinge on how successfully the proceeds of the crime are invested. (The forfeiture provision applicable to money laundering cases prevents the launderer and his criminal client from keeping the profits of the money laundering operation. See 18 U.S.C. § 982(a)(1) (requiring forfeiture of "any property, real or personal, involved in [money laundering], or any property traceable to such property") (emphasis added).)

Accordingly, we hold that the district court erred in its interpretation of the sentencing guidelines when it found that Paley was responsible for the stock's appreciation in value. Cf. United States v. Pizano, 421 F.3d 707, 727 (8th Cir. 2005) (holding that "in a money-laundering offense involving layering, the 'value of the laundered funds' is the amount originally derived from criminal activity and then laundered, not the aggregate total of the funds involved in each layer" and stating that "the 'value of the laundered funds' should be limited to funds originally injected or infused into the money-laundering scheme").

## IV.

The government urges us to hold that the district court's error in interpreting the guidelines was harmless. An error is harmless if it "did not affect the district court's selection of the sentence imposed." Williams v. United States, 503 U.S. 193, 203, 112 S. Ct. 1112, 1121 (1992). The government bears the burden of

persuading us that the district court would have imposed the same sentence even if it had not erred in interpreting the guidelines.  See id., 112 S. Ct. at 1121.  It points out that the district court stated that sentencing Paley to 18 months imprisonment, the low end of the range, "does adequately reflect the seriousness of the offense and provides just and reasonable punishment" and that the court noted that Paley could have faced a money laundering charge carrying a potential 20-year sentence.  But the district court also said that "[t]his, quite frankly, is a difficult sentencing for the Court," and disclosed that it was "greatly influenced by the Advisory Guidelines."  Considering all of the court's statements, we are not persuaded that the government has carried its burden of showing that the district court would have given Paley the same sentence regardless of its error in calculating the guidelines range.  It might have, but it might not have.

We note in closing that this is a good example of a case in which the district court could have avoided the necessity of appellate review and a remand for resentencing on this issue by explicitly stating—if true—that even if the court were wrong on the disputed guidelines issue, it would have imposed the same sentence under the guidelines (since the sentence was within both possible ranges) or by using the 18 U.S.C. § 3553(a) factors.  See United States v. Williams, 431 F.3d 767, 773–76 (11th Cir. 2005) (Carnes, J., concurring).

12

For the foregoing reasons, we REVERSE the district court's interpretation of

U.S.S.G. § 2S1.1(a)(2) and REMAND for resentencing.