# United States Court of Appeals
## For the First Circuit

No. 09-1144

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT M. MARDIROSIAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

Jeanne M. Kempthorne for appellant.
Jonathan F. Mitchell, Assistant United States Attorney, with
whom Michael K. Loucks, Acting United States Attorney and Ryan M.
DiSantis, Assistant United States Attorney, were on brief, for
appellee.

April 14, 2010

**HOWARD**, **Circuit Judge**.  Defendant-Appellant Robert M. Mardirosian was convicted by a jury of one count of possessing, concealing or storing six stolen paintings, including a rare Cézanne valued at $29 million, in violation of 18 U.S.C. § 2315. On appeal, Mardirosian argues that there was insufficient evidence for the jury to conclude that he possessed stolen property during the applicable five-year statute of limitations period, because the owner had given him legal title to the paintings in a 1999 agreement.  Even if the agreement was invalid, Mardirosian contends, he subjectively believed that he held title to the paintings after 1999 and thus the government could not prove he knowingly possessed stolen property, as required by § 2315. Mardirosian further claims that the district court erred in instructing the jury that this agreement did not provide him with a viable mens rea defense to the charge.  He also appeals his sentence, alleging errors in the application of the Sentencing Guidelines.  Finding no error, we affirm.

## I. Facts

For purposes of the sufficiency challenge, we recite the facts in the light most favorable to the verdict. United States v. Marin, 523 F.3d 24, 27 (1st Cir. 2008).  Just after Memorial Day weekend in 1978, Michael and Doris Bakwin discovered that seven valuable paintings had been stolen from their Stockbridge,

Massachusetts home -- including two portraits by Chaim Soutine and a still-life by Paul Cézanne.[1] Michael Bakwin advertised a $25,000 reward in regional newspapers for the return of the paintings, and state and federal authorities launched an investigation. The focus soon narrowed to a small group of suspects, including David Colvin of Pittsfield, Massachusetts.

During the investigation, Mardirosian, a criminal defense attorney, was representing Colvin in an unrelated firearms case. Although Mardirosian did not testify at his own trial, he had presented his version of how he came into possession of the paintings in a 2006 interview with a Boston radio station. The jury heard a tape of the interview, in which Mardirosian claimed that, on the day before a hearing in Colvin's firearms case, Colvin appeared at Mardirosian's office for a meeting carrying a bag containing the seven paintings stolen from the Bakwin home. According to Mardirosian, Colvin said he planned to sell the paintings, but Mardirosian convinced him not to do so. At the end of the meeting, Colvin asked Mardirosian to help him find a place to spend the night. Mardirosian directed Colvin to the loft of an office building that Mardirosian owned.

---

[1]The paintings were <u>Bouilloire et Fruits</u> by Paul Cézanne, <u>Portrait d'une Jeune Fille</u> and <u>Portrait d'un Jeune Homme</u> by Chaim Soutine, <u>Maison Rouge</u> by Maurice Utrillo, <u>Flowers</u> by Maurice de Vlaminck, and <u>Woman Seated</u> and <u>Boy</u> by Jean Jansem.

The following day, Colvin pleaded guilty to the firearms charge and was sentenced to one year of probation. In February 1979, he was shot and killed. The investigation into the art theft stalled.

Some months after Colvin's death, while cleaning out the loft where Colvin had stayed, Mardirosian happened upon the bag of paintings. He chose not to contact Bakwin or law enforcement, but rather began investigating how to profit from his discovery. Mardirosian first researched whether he might obtain insurance proceeds for the return of the paintings, but rejected the idea because the most valuable painting, the Cézanne, was not insured. It is unclear what Mardirosian did next with the paintings, but in 1988 he had the paintings shipped out of the United States and, at some point thereafter, stored them in the vault of a major Swiss bank.

It was only in 1999, through Mardirosian's botched attempt to sell the Cézanne in London through a third-party representative, that authorities picked up the trail of the missing paintings. Tony Westbrook, a British citizen acting on Mardirosian's behalf as the anonymous holder, had contacted Lloyd's of London to try to insure the shipment of the Cézanne from Russia to London in preparation for sale. The inquiry prompted Lloyd's to alert the Art Loss Register (ALR), a London-based organization that maintains a database of stolen artwork and verifies the provenance

of art for private collectors and major auction houses. The ALR confirmed that the Cézanne was the same painting stolen from Bakwin's home in 1978. It notified British authorities and the FBI, and then signed an agreement with Bakwin whereby the ALR would attempt to recover all seven stolen paintings in exchange for a commission.

The ALR approached Westbrook to see if it could determine the identity of the mysterious seller and arrange for the paintings' return. Westbrook, who claimed to receive his marching orders by telephone from an anonymous caller, said he knew only that the holder of the paintings had an American accent and insisted on anonymity.

In March 1999, Mardirosian, through Westbrook, demanded $15 million for the return of the paintings. Bakwin refused. Mardirosian renewed his demand for payment in August 1999 through a new agent, Swiss lawyer Bernard Vischer. Vischer informed the founder and chairman of the ALR, Julian Radcliffe, that the holder of the paintings was looking for a payment in the "millions of dollars." Vischer threatened that "his client would take the pictures away and hang them on his wall if we didn't do a deal." Bakwin again refused.

By this time, Bakwin was losing faith that he would be able to recover his paintings through negotiations. He reluctantly agreed to convey six of the paintings, together worth about $1

million, to the anonymous holder in exchange for the return of the Cézanne. As part of the agreement, the ALR insisted that the paintings' anonymous holder complete an affidavit confirming that he was not involved in the original theft. The parties agreed that the affidavit would be held in escrow by Herbert Smith, a London-based law firm, and that it would be opened only if required by court order.

On October 25, 1999, Vischer and Radcliffe met in Geneva to execute the agreement (hereinafter the "1999 Agreement"), accompanied by attorneys and experts from Sotheby's who could verify the painting's authenticity. Vischer spoke with someone on his cell phone, and then announced that he would retrieve the Cézanne and bring it to the boardroom. He left the room and headed to the front of the building, with Radcliffe and the others in tow. Once outside, Vischer walked to a nearby corner. A white car pulled up beside him, and the back passenger window lowered. A passenger in the backseat, his face shrouded from view, handed Vischer a black trash bag. The car sped away. Vischer returned to the boardroom and handed the trash bag to the experts from Sotheby's, who carefully opened it to reveal the stolen Cézanne.

The Cézanne's authenticity confirmed, Radcliffe signed the agreement on behalf of the Art Loss Register. Vischer signed on behalf of the "Erie International Trading Company," a Panamanian Corporation formed to hold title to the six paintings for

Mardirosian as the anonymous holder. On November 16, 1999, Radcliffe provided Vischer with a bill of sale that purported to deed title to the paintings and told Vischer that the ALR's records would reflect that title to the six stolen paintings had passed to the holder by settlement.

Bakwin sold the Cézanne in December 1999 for $29.3 million. Discussions regarding the remaining six paintings continued. In early 2000, Vischer told Radcliffe that the anonymous holder would be willing to sell the paintings to Bakwin for $1 million. Bakwin refused. Vischer dropped the demand to $500,000. Bakwin remained adamant that he would not pay any cash to the anonymous holder. Talks between the parties broke off.

Three years later, Mardirosian again sought to sell the six paintings, this time to a private buyer. In December 2003, he approached Paul Palandjian, a Boston-based real estate developer and family friend. Mardirosian told Palandjian that the paintings had been stolen, but that he had received title as part of a valid contract. Palandjian later agreed to represent Mardirosian as the anonymous holder for the purpose of selling the paintings.

Palandjian contacted Sotheby's to gauge the auction house's interest in the paintings. Sotheby's knew of the paintings' history and was intrigued, but it wanted to view them and verify title before it agreed to include them in its next Impressionist art auction. Palandjian and Mardirosian began making

arrangements to meet Sotheby's demands. Palandjian flew to Geneva, where Mardirosian had arranged for a friend to deliver the paintings to Palandjian's hotel room. Palandjian then took the paintings to a Sotheby's representative at the Geneva offices of Bank Sarasin for inspection.

Sotheby's ultimately made an offer to sell four of the six paintings. In January 2005, it contacted the ALR to check the status of the paintings' title. Radcliffe immediately saw an opportunity to seize the paintings when they arrived in London for auction. If he told Sotheby's the paintings were stolen, however, he worried that word could get back to the seller, who then would not ship them. Radcliffe thus told Sotheby's that the titles of the paintings were cleared for sale.

Relying on the ALR's assurances, Palandjian authorized Sotheby's to ship the paintings from Geneva to London in April 2005. In May 2005, with the paintings safely on British soil, Bakwin sued Sotheby's to enjoin their sale. The British court ordered Sotheby's to return the paintings to Bakwin, and it directed the parties to open the envelope held in escrow at Herbert Smith.[2] In January 2006, the 1999 affidavit was unsealed, identifying Mardirosian as the anonymous holder.

---

[2]The district court excluded from evidence any reference to the British lawsuit, but it allowed the jury to hear about the halting of the sale and unsealing of the affidavit.

On March 8, 2007, a grand jury indicted Mardirosian on two counts. Count One alleged that from 1978 to 2005, Mardirosian possessed stolen property that had crossed a United States boundary in violation of 18 U.S.C. §§ 2315 and 2. Count Two charged Mardirosian with causing four of the paintings to be transported in foreign commerce from Geneva, Switzerland to London, England in violation of 18 U.S.C. §§ 2314 and 2.[3] On August 18, 2008, the sixth day of trial, the jury convicted Mardirosian on Count One. The district court subsequently sentenced Mardirosian to seven years' imprisonment and three years of supervised release; it also ordered him to pay a $100,000 fine and to return the stolen paintings.

## II. Discussion

### A. Sufficiency of the evidence

To support a conviction under 18 U.S.C. § 2315, the government must prove beyond a reasonable doubt that (1) the property was stolen; (2) after the property was stolen, it crossed a United States boundary; (3) the defendant possessed, concealed, or stored the property; (4) the defendant knew the property was

---

[3] The district court dismissed the second count at trial for failure to state an offense, on the grounds that "foreign commerce" did not include commerce between two foreign countries. The parties do not appeal this ruling.

-9-

stolen; and (5) the property was worth $5,000 or more.  United States v. Tashjian, 660 F.2d 829, 839 (1st Cir. 1981).

We review insufficiency claims de novo, "eschewing credibility judgments and drawing all reasonable inferences in favor of the verdict, to ascertain if a rational jury could have found that the government proved each element of the crime beyond a reasonable doubt."  United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993).

Mardirosian does not dispute that he possessed the stolen paintings in violation of the statute from 1978 to 1999.  The crux of his argument is not that his actions were entirely innocent, but rather that the 1999 Agreement ended his ongoing possession offense, triggering the five-year statute of limitations under 18 U.S.C. § 3282(a).  The effect of the 1999 Agreement was twofold, he avers.  First, in light of this agreement, the government could not prove beyond a reasonable doubt that the paintings remained "stolen" after March 8, 2002, the five-year statute of limitations period leading up to the indictment.  Second, Mardirosian contends that the government failed to prove that he knew that the paintings were stolen, because Mardirosian believed that the 1999 Agreement gave him title.  We consider these arguments in turn.

-10-

**1. The "stolen" character of the paintings**

Mardirosian urges us to consider the circumstances surrounding the 1999 Agreement's formation in determining its validity. If we determine that duress did not play a role in the transaction, he argues, we should hold that the Agreement was a valid contract that ended his unlawful possession. We need not undertake this analysis, however, because we agree with the district court that the 1999 Agreement was void ab initio as a contract for an illegal purpose.

It is well-established that contracts for illegal purposes are void as a matter of public policy. See, e.g., Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 77 (1982) ("There is no statutory code of federal contract law, but our cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law."); Kiely v. Raytheon Co., 105 F.3d 734, 737 (1st Cir. 1997) ("[C]ourts will not lend their aid to relieve parties from the results of their own illegal adventures."). State common law is the same. When a contract is void ab initio, the contract "may not be enforced," and the court will treat the contract "as if it had never been made." Mass. Wholesale Elec. Co. v. Town of Danvers, 577 N.E.2d 283, 292-93 (Mass. 1991).

The 1999 Agreement was illegal in that Mardirosian conditioned the return of the stolen Cézanne on Bakwin's

-11-

relinquishment of title to the six remaining paintings.  We tread no new ground in declaring that the act of demanding a fee for the return of stolen property is unlawful.  See, e.g., Commonwealth v. Valleca, 263 N.E.2d 468 (Mass. 1970) (defendant convicted of receiving stolen property where he demanded a fee in exchange for property's return); Slaughter v. State, 38 S.E. 854, 855 (Ga. 1901) (finder of property would be guilty of larceny if he concealed the property for the purpose of returning it once a reward had been offered); Dunn v. State, 30 S.W. 227 (Tex. 1895) (taking of property with intent to conceal it until a reward is offered is larceny); Berry v. State, 31 Ohio St. 219 (1877) (same); Commonwealth v. Mason, 105 Mass. 163 (1870) (defendant who kept neighbor's horse until a reward was offered was guilty of larceny).

Mardirosian warns that holding such bald demands for payment to be void ab initio would curtail the ability of rightful owners to freely transfer their property and would cause subsequent owners of once-stolen goods to violate 18 U.S.C. § 2315 simply by taking possession of the property.  Neither observation is accurate, and in any event the facts of this case do not even arguably suggest that the paintings did not remain stolen during the post-Agreement period.  The paintings were not returned or proffered to the victim upon acquisition by the possessor, even, for example, in response to an offered reward; indeed the reward

had been long since retracted.  The painting was returned only on a demand for payment as outlined in the Agreement.[4]

## 2. **Mardirosian's knowledge that the paintings were stolen**

Mardirosian also argues that even if the 1999 Agreement was void, he subjectively believed it gave him title to the six paintings.  Thus, he contends, the government could not prove that he possessed the requisite knowledge that the property was stolen to be convicted under 18 U.S.C. § 2315.  This argument requires us to consider the boundaries of the mistake-of-fact doctrine.

It is a basic principle of criminal law that "ignorance or mistake of fact may provide a defense to a crime if it negates the requisite element of intent . . . ." United States v. Fuentes-Moreno, 895 F.2d 24, 27 (1st Cir. 1990).  In the classic example, a man who takes another's umbrella home from a restaurant under the

---

[4]We reject Mardirosian's argument, raised for the first time on appeal, that, in light of the court's invalidation of the 1999 Agreement, 18 U.S.C. § 2315 did not provide fair warning that Mardirosian's conduct was illegal, as required by the Due Process Clause of the Fifth Amendment.  The notion that a contract for an illegal purpose is void ab initio is by no means novel, nor is 18 U.S.C. § 2315 ambiguous merely because it does not specifically characterize the property obtained through such an unlawful negotiation as "stolen."  Due process does not require that criminal statutes delineate every conceivable type of conduct that could come within their purview.  See United States v. Lanier, 520 U.S. 259, 271 (1997) (due process requirements are not "designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited").

mistaken impression that the umbrella is his is not guilty of larceny because he does not intend to steal another's property, and thus does not have the requisite state of mind to be guilty of the crime. Wayne R. LaFave, Criminal Law § 5.1 (3d ed. 2000).

Mardirosian asserts that his mistaken belief that the paintings were his, if true, would create a legitimate mistake of fact that would absolve him of the crime. He relies on United States v. Schultz, 333 F.3d 393 (2d Cir. 2003). In Schultz, a defendant charged with smuggling Egyptian artifacts into the United States claimed that he did not know that the objects were "stolen" under Egyptian patrimony law. The Second Circuit affirmed a jury instruction that the defendant's knowledge of Egyptian law might bear on his knowledge that the artifacts were stolen. Id. at 410 n.11, 411.

Mardirosian overlooks a crucial and dispositive distinction between Schultz and this case, however. In Schultz -- as in other mistake-of-fact cases -- the defendant argued that his conduct was at all times innocent and that he never possessed the requisite mens rea to be guilty of the charged crime. Id. at 410.; see also U.S. v. Smith-Baltiher, 424 F.3d 913 (9th Cir. 2005) (defendant charged with attempted illegal reentry into the United States was entitled to present defense that he mistakenly believed he was a United States citizen at the time of his attempted entry); People v. Rivera, 203 Cal. Rptr. 842 (Cal. Ct. App. 1984)

-14-

(defendant's belief that victim consented to sexual advances was a defense to rape); State v. Mainaaupo, 178 P.3d 1 (Haw. 2008) (defendant prosecuted for unauthorized control of a motor vehicle could assert that he mistakenly believed that the person who authorized his operation of the vehicle was the vehicle's owner); General v. State, 789 A.2d 102 (Md. 2002) (defendant charged with failing to remain at the scene of an accident resulting in injury or death was entitled to introduce defense that he believed he had struck a white bag and not a person); Reese v. State, 745 P.2d 1146 (N.M. 1987) (defendant not guilty of assaulting a police officer if he believed the victim was an ordinary citizen because the offense required knowledge that the victim was a police officer). Indeed, the underlying purpose for the mistake-of-fact doctrine is to protect from prosecution actors who are not morally culpable. See Barlow v. United States, 32 U.S. 404, 411 (1833) (likening mistakes of fact to accidents "consistent with entire innocence of intention"). Mardirosian cannot and does not claim that he acted innocently. He concedes that his conduct satisfied all elements of the crime with which he is charged, but beseeches us to find that his subsequent mistake of fact ended his crime and placed him beyond the law's reach.

We know of no case -- certainly none has been cited by the parties -- that has recognized a mistake-of-fact defense once all elements of the crime have been met. Although we are hesitant

to announce categorically that we would never extend the doctrine, the facts of this case illustrate why we would be reluctant to do so, and why we will not do so here. Were we to recognize subsequent mistakes of fact, sophisticated criminals would have the incentive to generate reasons to believe that their conduct is no longer wrongful. Like Mardirosian, some might seek to "contract" with their victims and could use more violent means of persuasion. We could not countenance such a result.[5]

The possession and concealment of stolen property is a continuous crime. U.S. v. Frezzo, 659 F. Supp. 54, 57-58 (E.D. Pa. 1987)(interpreting 18 U.S.C. § 2315). We agree with the district court that the jury's finding that Mardirosian knew the paintings were stolen at some point after taking possession of them was sufficient to satisfy 18 U.S.C. § 2315's mens rea requirement.

## B. Jury Instructions

Mardirosian also challenges the jury instructions provided at trial for the same reasons underpinning his sufficiency claims. The trial judge instructed the jury that if the government proved all five elements of 18 U.S.C. § 2315 were satisfied, and

[5]We stress that there remains a simple way to bring an end to the unlawful possession of stolen property. Mardirosian need only have returned the six paintings to their owner. Had he done so, his crime would have ended, and the five-year statute of limitations would have begun to run. See 18 U.S.C. § 3282.

-16-

"that any possession of stolen paintings by Mr. Mardirosian was not for the purpose of exchanging them for a reward that had been offered or that he actually believed had been offered," the 1999 Agreement did not provide Mardirosian with a valid defense.[6] Mardirosian claims that the instructions improperly stated the law, in that they prevented the jury from considering whether the 1999 Agreement altered the character of the stolen property or vitiated Mardirosian's mens rea. We review de novo claims that an

---

[6]Mardirosian objected specifically to the following instructions:

> [T]he fifth thing the Government must also prove beyond a reasonable doubt is that Mr. Mardirosian knew that any paintings he possessed in Massachusetts had at some time previously been stolen. It would be sufficient for the Government to prove that Mr. Mardirosian knew that any painting he possessed had been stolen in about 1978. . . .
> [T]he law does not permit a person to benefit from his own illegal conduct. Therefore, the 1999 contract would not provide Mr. Mardirosian with a defense to the charge against him. The question of whether Mr. Bakwin entered into the 1999 contract as a result of coercion or duress might be important in a private civil suit between Mr. Bakwin and Mr. Mardirosian, but it is not a question that makes a difference in this criminal prosecution of Mr. Mardirosian by the United States, nor does it make a difference whether or not Mr. Mardirosian honestly believed that in view of the 1999 contract, his conduct after March 8, 2002 violated Federal law. If the Government proves beyond a reasonable doubt the first five elements of the crime charged in Count 1 and it also proves that any possession of stolen paintings by Mr. Mardirosian was not for the purpose of exchanging them for a reward that had been offered or that he actually believed had been offered before he possessed them, the 1999 agreement involving Mr. Bakwin does not provide him with a valid defense to Count 1.

-17-

instruction embodied an error of law. United States v. Nascimento, 491 F.3d 25, 33-34 (1st Cir. 2007).

We make short work of Mardirosian's claim. The jury instructions were consistent with our holding above that the 1999 Agreement had no bearing on the "stolen" character of the paintings or on whether Mardirosian possessed the requisite mens rea to be convicted under 18 U.S.C. § 2315. These instructions provided a clear, accurate description of the substantive law.

**C. Words used to describe the 1999 Agreement**

As a final attack on his conviction, Mardirosian challenges the district court's decision to allow Bakwin and the government to use certain words to characterize Mardirosian's actions in connection with the 1999 Agreement.

Specifically, Mardirosian objects to Bakwin's description of the 1999 Agreement at trial as "extortion" and "something like kidnaping." Bakwin testified that his initial response to the proposed 1999 Agreement was to tell Radcliffe that it was "extortion, but if we can get the painting back that way, I can't believe that we could not also get the other six paintings." Later, when asked why he entered into the agreement, Bakwin stated, "Well, first of all, I wanted desperately to get the paintings back, and second of all, I felt that this was just extortion, and

-18-

he had no right to the six other paintings. . . . I felt it was something like kidnaping."

Mardirosian also objects to the government's repeated use of the word "ransom" to describe the terms of the 1999 Agreement during its opening and closing statements.

## 1. Bakwin's testimony

Mardirosian argues on appeal that Bakwin's characterization of the 1999 Agreement had no probative value in proving the criminal offense charged, in light of the district court judge's ruling that the role of duress in the execution of the agreement had no bearing on Mardirosian's criminal trial. Because its prejudicial impact outweighed its probative value, he contends, the testimony should have been excluded under Rule 403 of the Federal Rules of Evidence.

Mardirosian did not object to Bakwin's testimony on relevance grounds at trial. He objected to Bakwin's statement to Radcliffe as hearsay and raised only general objections to the remainder of the disputed testimony. These objections were insufficient to preserve Mardirosian's challenge to the evidence's probative value on appeal. See United States v. Carrillo-Figueroa, 34 F.3d 33, 39 (1st Cir. 1994) ("Unless the basis for objection is apparent from the context, the grounds for objection must be specific so that the trial court may have an opportunity to address

-19-

the claim later sought to be presented on appeal."); see also, United States v. Mercado, 412 F.3d 243, 247 (1st Cir. 2005) ("It is well established that an objection on one ground does not preserve appellate review of a different ground.").

Our review is therefore only for plain error. To prevail under this standard, Mardirosian must show that "(1) an error occurred, (2) the error was clear or obvious, (3) the error affected his substantial rights, and (4) the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Medina-Martinez, 396 F.3d 1, 8 (1st Cir. 2005).

We note that Bakwin's testimony was in fact highly relevant to the prosecution's case. A central theme of Mardirosian's defense at trial was that the 1999 Agreement was a valid agreement between sophisticated business people and represented Mardirosian's good faith effort to return the stolen paintings to Bakwin. Bakwin's testimony undermined these arguments by suggesting that Bakwin did not enter into the agreement willingly. The testimony was also important to the government's case in that it provided proof that Mardirosian did not seek through the 1999 Agreement to return the paintings for a reward that he actually believed had been posted. As we find no error occurred, Mardirosian's claim fails.

## 2. The government's use of the word "ransom"

Mardirosian claims that the government's use of the word "ransom" to describe the negotiations surrounding the 1999 Agreement was unfair and prejudicial. We review the propriety of the government's opening and closing statements de novo. See United States v. Carpenter 494 F.3d 13, 22 (2007), cert. denied, 128 S.Ct. 1442 (2008). That said, we give much deference to the trial judge's determinations regarding the "accuracy in description, threat of unfair prejudice, frequency of use, and alternative means of description." United States v. Felton, 417 F.3d 97, 103 (1st Cir. 2005).

We think the term "ransom," while highly provocative, accurately describes the nature of the 1999 Agreement. A "ransom" is defined as "a consideration demanded for the release of someone or something from captivity." Merriam-Webster's Collegiate Dictionary 965 (10th ed. 1993). Mardirosian demanded that Bakwin deed him title to the six paintings in question before he would release the stolen Cézanne. His demand neatly fit the definition of a "ransom," and the government did not improperly use the term. See Felton, 417 F.3d at 103 (finding that the government's use of the term "terrorist" to describe the defendants and their actions was "highly pejorative," but that this was "a function of the acts that the defendants engaged in, not the government's inaccurate description of those acts").

-21-

**D. Sentencing claims**

Finally, Mardirosian challenges the district court's assessment of a 22-level sentencing enhancement for the value of the paintings, based on its calculation that Mardirosian's offense resulted in an overall loss of $30.2 million. Mardirosian maintains that the $29 million Cézanne should not have been included in the loss calculation, because he returned it before his offense was detected. The six remaining paintings combined were worth at most $1.2 million, which would have yielded a 14-level enhancement. In the alternative, Mardirosian objects to the court's use of the Cézanne's 1999 auction price to determine its value.

We review the trial judge's interpretation of the Sentencing Guidelines de novo and findings of fact for clear error. United States v. Ortiz-Torres, 449 F.3d 61, 72 (1st Cir. 2006).

Mardirosian relies on the language of Application Note 3(E) of the commentary to section 2B1.1 of the 2004 Sentencing Guidelines in arguing that the Cézanne should have been excluded entirely from the loss calculation. Application Note 3(E) instructs the trial court to reduce its loss calculation by the "fair market value" of property returned to the victim "before the offense was detected."[7] The district court determined that

---

[7]Application Note 3(e) provides:
Credits Against Loss. -- Loss shall be reduced by the following:

-22-

"detection of the offense" occurred in 1978, when Bakwin discovered that his paintings had been stolen. Mardirosian asks us to adopt a different reading; he argues that the offense was not detected until January 2006, when he was identified as the perpetrator.

Mardirosian's reading of "offense" to refer to the discovery of the identity of the perpetrator distorts the plain meaning of the word. The Sentencing Commission's commentary is to be "read in a straightforward, commonsense manner." <u>United States</u> v. <u>Carrasco-Mateo</u>, 389 F.3d 239, 244 (1st Cir. 2004). The sensible reading of "offense" is that it refers to the crime itself, not the discovery of the perpetrator. Thus, credit for the return of property under Application Note 3(e) is only available if the property is returned before either the victim or law enforcement becomes aware of the crime.[8]

---

(i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim <u>before the offense was detected</u>. The time of detection of the offense is the earlier of (*I*) the time the offense was discovered by a victim or government agency; or (*II*) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.
U.S.S.G. § 2B1.1 cmt. n. 3(e)(emphasis added).

[8]We find further support for this interpretation in the fact that other circuits, in describing the moment of detection under Application Note 3(e), have focused on the detection of the crime rather than on the discovery of the perpetrator's identity. <u>See, e.g.</u>, <u>United States</u> v. <u>Austin</u>, 479 F.3d 363, 370 (5th Cir. 2007) (observing that an offense is detected under the Guidelines commentary when the government "discovers the <u>fraud</u>")(emphasis

Moreover, crediting Mardirosian with the return of the Cézanne would ignore the gravity of his crime. The Sentencing Guidelines treat loss "as a proxy for the seriousness of the [defendant's] fraud." Austin, 479 F.3d at 369. Mardirosian concealed the Cezanne for 20 years, and it was only after he realized that he could not sell the stolen painting without being caught that he reached out to Bakwin to negotiate over its return. Even then, he conditioned the Cezanne's return on the transfer of title to the six other paintings. Mardirosian is not entitled to a credit for this behavior that would place him on the same plane as a repentant thief who returned stolen property before the owner even noticed its absence.[9]

Nor do we find that the district court erred in calculating loss under Section 2B1.1 of the Sentencing Guidelines by assigning the Cézanne the value of its 1999 auction price.

---

added); United States v. Mau, 45 F.3d 212, 216 (7th Cir. 1995) (defining the time to determine a loss in a check kiting scheme as the moment the loss is discovered) (emphasis added); United States v. Swanson, 360 F.3d 1155, 1169 (10th Cir. 2004) (pinpointing the date of detection as "the date of discovery of the fraud")(emphasis added).

[9]Mardirosian argues that our reading of Application Note 3(e) will provide a windfall to white-collar criminals who can conceal their crimes because they will have a longer window to claim credits for returning property to their victims than robbers or burglars whose crimes are detected immediately. While we do not dispute that this may be true, we see no problem with this result. A defendant's opportunities to mitigate his crime, just like the punishment itself, are the product of the crime he has chosen to commit.

Mardirosian contends that the court should have assigned the Cézanne its 1978 value, because courts should not consider the appreciated value of stolen property in calculating loss. Mardirosian cites two cases for this proposition: United States v. Trupin, 117 F.3d 678 (2d Cir. 1997), and United States v. Paley, 442 F.3d 1273 (11th Cir. 2006).

As a preliminary matter, we do not agree with the government that Mardirosian waived this issue on appeal. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") Mardirosian's development of his claim on appeal -- though brief -- was enough to alert us to his precise challenge.

But although Mardirosian's claim overcomes this first hurdle, it collapses on the merits. Neither of the cases Mardirosian cites supports the conclusion that the district court's calculation of loss was clearly erroneous. In Trupin, the Second Circuit found that the district court, in calculating loss, did not abuse its discretion in assigning a stolen painting its value at the time of theft rather than at the time the defendant had last possessed it. The Second Circuit held that the district court had reasonably analogized the painting's appreciation to accrued interest, which was excluded from the loss calculation under an

older version of Application Note 2 to Section 2B1.1.[10]  At the same time, it emphasized that it was not holding that "as a matter of law, appreciation in value cannot be considered when calculating loss," and it observed that "a district court could properly go either way on this question." Id.  Paley is inapposite here, as it examines the calculation of value under the sentencing guideline for money-laundering, an entirely different provision, Section § 2S1.1.[11]

Mardirosian further asserts that the 1999 auction price in particular is an unfair measure of Bakwin's loss and his culpability, because it was not reasonably foreseeable that the Cézanne would appreciate almost 50-fold between 1978 and 1999.  We disagree.  It is entirely foreseeable that a painting by a famous artist would appreciate with time, even if Mardirosian did not know by exactly how much.  That the painting's value would grow exponentially was a risk he assumed when he concealed the painting

---

[10] This concept is now found in Application Note 3(D)(i), which excludes from loss calculation "[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs."

[11] The Eleventh Circuit in Paley based its interpretation of Section 2S1.1 in large part on a 2001 revision that changed the relevant term for sentence calculation purposes from "the value of the funds" to "the value of the laundered funds."  This insertion of the modifier "laundered," the court found, signified that the funds to be considered for sentencing purposes were "those that were actually laundered."  Mardirosian does not make a similar textual argument with respect to Section 2B1.1, nor is one readily apparent.

for two decades.  It is not a reason to disturb the district court's ruling on appeal.  The district court's use of the Cézanne's 1999 auction price in its calculation of loss was not clearly erroneous.

### III. Conclusion

For the reasons provided above, we affirm the conviction and sentence.

**AFFIRMED.**